UNITED STATES of America

v.

John M. POINDEXTER, Appellant.

No. 90–3125.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 28, 1991.

Decided Nov. 15, 1991.

Keith A. Jones, with whom Richard W. Beckler, Joseph T. Small, Jr., Stephen M. McNabb, Frederick Robinson, Michael G. McGovern, and Susan C. Maxson, were on the brief, for appellant.

Andrew L. Frey, Atty., Office of Independent Counsel, with whom Lawrence E. Walsh, Independent Counsel, Christian J. Mixter, and Louise R. Radin, Attys., OIC, were on the brief, for appellee.

Kate Martin, C. Douglas Floyd, Kevin R. Sullivan, and Craig E. Stewart were on the brief for American Civil Liberties Union, amicus curiae, in support of appellant.

Before MIKVA, Chief Judge, D.H. GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

Dissenting opinion filed by Chief Judge MIKVA.

D.H. GINSBURG, Circuit Judge:

John M. Poindexter was convicted on five felony counts arising from the part he played, while National Security Advisor, in the so-called "Iran/Contra Affair," *see United States v. North*, 910 F.2d 843, 851 (*"North I"*), *modified*, 920 F.2d 940 (D.C.Cir.1990) (*"North II"*). We reverse as to all counts because the Independent Counsel (IC) has not carried his burden of showing that Poindexter's compelled testimony was not used against him at his trial in violation of 18 U.S.C. § 6002 and the Fifth Amendment of the Constitution. We also reverse as to the two counts for violating 18 U.S.C. § 1505, on the ground that the statute as written cannot constitutionally be applied to some of the conduct, specifically lying to or misleading the Congress, with which Poindexter is charged in those counts. On the other hand, we reject Poindexter's argument that he cannot be penalized under § 1001 for making false statements to the Congress. The case is remanded to the district court for such further proceedings on the indictment as the IC may pursue. *See* Part II.C below.

## I. FACTS

### A. *Support of the Contras*

In 1984 the Congress passed the so-called Boland Amendment, which prohibited United States intelligence agencies from providing military support to the rebel "Contras" then attempting to overthrow the "Sandinista" government of Nicaragua. In 1985 during the tenure of National Security Advisor Robert McFarlane, National Security Council staff member Oliver North and others became involved in a plan to give military advice and fund-raising aid to the Contras. In August of that year McFarlane responded to congressional inquiries with letters falsely stating that neither North nor anyone else on the NSC staff was providing such assistance. Poindexter succeeded McFarlane as National Security Advisor in December; during his one year in that position North and others, with Poindexter's knowledge, continued the Contra support program.

House Resolution 485, a Resolution of Inquiry relating to NSC assistance to the Contras, was introduced in June 1986. On July 21, in response to requests for information, Poindexter sent letters to the chairmen of two House committees, stating that the "information" provided by McFarlane in the earlier letters had "made it clear that the actions of the National Security Council staff were in compliance with both the spirit and letter of the law regarding support of the Nicaraguan resistance." Poindexter also arranged an August 6 meeting between North and Members of the House Intelligence Committee, at which North denied giving assistance to the Contras.

### B. *Arms Shipments to Iran*

Also with Poindexter's knowledge, North became involved in a plan to ship missiles from Israel to Iran in November 1985. In December of that year President Reagan made a written "Finding," pursuant to the Foreign Assistance Act of 1961, 22 U.S.C. § 2422, retroactively authorizing the November arms shipment. The purpose of the shipment, according to the Finding, was to obtain Iran's assistance in securing the release of United States citizens being held hostage in Lebanon. In January 1986 the President made a second Finding, this one covering future shipments of arms and stating that the purpose of those shipments was to support moderate elements in the

Iranian government. Additional missiles were subsequently shipped to Iran.

In November 1986 the press reported allegations that arms had been exchanged for hostages. The President then stated publicly that the arms sales had been intended to improve relations with Iran, rather than to secure the release of hostages, and he made public the second Finding.

On November 21, 1986 Poindexter had separate meetings with Members of the House and of the Senate Intelligence Committees. It is the theory of the IC prosecuting this case that "[a]n acknowledgment of United States involvement in [the November 1985 arms] shipment might have triggered a search for the initial Presidential Finding, which would have revealed the character of the transaction as an exchange of arms for hostages." Instead, the indictment alleges, Poindexter made false statements at those meetings regarding when he learned of the shipment and when he learned that others might have had prior knowledge of it. Soon after the meetings Poindexter, with North present, destroyed the first Presidential Finding.

## C. Compelled Testimony, Indictment, and Trial

During the ensuing congressional investigation, Poindexter was compelled to testify before the Congress under a grant of use immunity pursuant to 18 U.S.C. § 6002. That testimony, covering his participation in the Iran/Contra events, received extensive national press coverage.

Subsequently, the IC secured a five-count indictment against Poindexter. Count 1 alleged a conspiracy to destroy official documents in violation of 18 U.S.C. § 2071, and to commit Counts 2 through 5. Count 2 charged that Poindexter corruptly obstructed the Congress in its consideration of House Resolution 485, in violation of 18 U.S.C. § 1505. This Count specified two obstructive acts in connection with the congressional inquiry into United States aid to the Contras: (1) sending false and misleading letters to the House committees in July 1986 referring to McFarlane's earlier letters, and (2) arranging the August 1986 meeting at which North falsely denied giving military advice to the Contras.

The remaining Counts concern the arms shipments to Iran and the Congress's inquiry into them. Counts 4 and 5 charged violations of 18 U.S.C. § 1001, the False Statements statute. According to Count 4, during the November 21, 1986 meeting Poindexter falsely stated to Members of the House Intelligence Committee (1) that he had not learned until January 1986 that missiles had been shipped to Iran in November 1985, and (2) that he had not learned until November 20, 1986 that anyone in the United States government might have had prior knowledge of that shipment. On the same date, per Count 5, Poindexter repeated to Members of the Senate Intelligence Committee the first of those alleged falsehoods.

Count 3 charged that Poindexter corruptly obstructed the Congress's inquiry, in violation of § 1505. The specific acts alleged were: (1) making the false statements alleged in Counts 4 and 5, (2) participating in preparation of a false chronology, and (3) deleting from his computer information regarding the arms shipment.

Poindexter and North were indicted together. They moved to dismiss the indictment on the ground that their immunized testimony had been used against them before the grand jury, see Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), but the judge to whom the cases were initially assigned sustained the indictment. After their cases were severed, the trial judge to whom Poindexter's case was reassigned adopted the prior judge's rulings as to the indictment, but took a number of steps in order to prevent the use of Poindexter's immunized testimony against him at trial, as required by Kastigar. The court compared the witnesses' expected testimony with their "canned" statements (i.e., statements taken before Poindexter gave his immunized testimony) and held hearings as to five of the witnesses. All were cleared to, and three did, testify at the trial. Poindexter was convicted on all five counts.

## II. USE OF IMMUNIZED TESTIMONY

Poindexter argues first that the IC "used" his immunized testimony against him, both before the grand jury and at trial, in violation of 18 U.S.C. § 6002 and the Fifth Amendment, and that therefore his convictions on all counts must be reversed.

Section 6002 provides:

Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

. . . . .

(3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,

and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but *no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case,* except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order. [Emphasis supplied.]

▆ The scope of immunity provided by § 6002 is coextensive with the scope of the Fifth Amendment privilege against compelled self-incrimination. *Kastigar,* 406 U.S. at 462, 92 S.Ct. at 1665. The Supreme Court has held that the statute "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness." *Id.* at 453, 92 S.Ct. at 1661 (emphasis in original). Once a defendant demonstrates that he has previously testified under a grant of immunity about a matter relevant to the case against him, the prosecution has the burden of showing that its evidence is not tainted by establishing that it had a legitimate source for the evidence "wholly independent of the compelled testimony." *Id.* at 460, 92 S.Ct. at 1665. We have recently held that a prohibited "use" occurs if a witness's recollection is refreshed by exposure to the defendant's immunized testimony, *North I,* 910 F.2d at 860–61, or if his testimony is in any way "shaped, altered, or affected," by such exposure, *id.* at 863. "*Kastigar* does not prohibit simply 'a whole lot of use,' or 'excessive use,' or 'primary use' of compelled testimony," we said. It prohibits "*any* use, direct or indirect." *Id.* at 861 (emphasis in original).

### A. *The Trial Court's Standard for "Use"*

All of the witnesses at Poindexter's trial had previously been exposed to the defendant's immunized testimony, although pre-exposure statements from some of the witnesses were available. The trial court made an *ex parte* comparison of the expected trial testimony of each witness both with the witness's own canned statements and with Poindexter's immunized testimony. After determining that the bulk of the expected testimony either had been previously canned or would not relate to subjects about which Poindexter gave immunized testimony, the court held an adversarial hearing (the "*Kastigar* hearing") as to three witnesses who ultimately testified at trial, in order to inquire further into whether they had been tainted by their exposure to Poindexter's immunized testimony. The witnesses' answers at this hearing satisfied the court that they would be able to testify from personal knowledge. We do not address Poindexter's contention that the procedures followed by the trial court are inadequate under *North,* because it is clear that the convictions cannot be affirmed for another reason.

In the district court, the IC maintained that immunized testimony is not "used" if it serves only to refresh a witness's recollection or if it merely influences his testimony, *see* Memorandum *re* Clarification of *Kastigar* Opinion, Jan. 4, 1990, at 2; Government's Memorandum of Points and Authorities in Support of Its Motion for Modification or Clarification of the Court's

*Kastigar* Ruling Concerning Proposed Witness Oliver L. North, Dec. 21, 1989, at 12–16. The trial court ruled on this issue before this court issued its opinions in *North;* and it is apparent in the record that its standard for "use" was not so broad as we held in *North* that the law requires. Indeed, during the *Kastigar* hearing, the court expressly rejected the defense's argument for a broad interpretation of "use" not unlike the one we later applied in *North:*

> The Court: The purpose of this hearing is to determine whether there are independent leads, or independent knowledge, by the witness to matters which Admiral Poindexter testified to in his immunized statements before the Congress. If it has nothing to do with that, it's not relevant to this hearing.
>
> . . . . .
>
> Defense counsel: [T]he Government ... is not making any attempt—and it has the burden to go forward—to show what [the witness] is saying right now, as he sits there on that stand—whether it comes directly out of his memory of his actual dealings with Admiral Poindexter prior to the hearings, or whether what's coming out of his mouth right now is *in any way, shape or position colored* by Admiral Poindexter's testimony. That's the same problem that Your Honor is addressing. That should be dealt with by the government as its burden to open this hearing.
>
> The Court: What I am addressing is not at all what you're addressing.

Transcript of *Kastigar* Hearing, Dec. 11, 1989, at 23–24 (emphasis supplied).

In its opinion on the *Kastigar* issue, the court said of its standard for "use":

> [Poindexter argues] that whatever instruction may have been given to ... witnesses, or whatever the evidence may indicate with respect to the independence of a witness' testimony in relation to Poindexter's immunized testimony in Congress, the government must demonstrate affirmatively that the immunized testimony did not, somehow, in some way, come to the attention of the wit-

nesses ... and [have] an influence on their thinking, even one for which they cannot at this time consciously account. The Court rejects this absolutist approach.

*United States v. Poindexter,* 727 F.Supp. 1488, 1491–92 (D.D.C.1989). *See also id.* at 1493; Transcript of *Kastigar* Hearing, Dec. 11, 1989, at 6–8.

■ The court's various applications of its standard even more clearly betray a conception of "use" much narrower than ours in *North.* For example, the court ruled that witness Kenneth deGraffenried could testify even though he had repeatedly stated during the *Kastigar* hearing that Poindexter's immunized testimony had "strengthened" his "hazy recollection" of events. 727 F.Supp. at 1499 & n. 32; *see also* Transcript of *Kastigar* Hearing, Dec. 11, 1989, at 129–31, 133–34. In gauging the admissibility of witness Oliver North's testimony, the court likewise suggested the view that if an exposed witness also has personal knowledge about a matter, then admission of his testimony involves no "use" (or at least the defendant bears the burden of proving that the witness' testimony does draw upon the defendant's immunized testimony). Early in the proceedings, the court ruled that any of North's testimony that either elaborated upon or contradicted Poindexter's testimony could not, "by definition," be tainted and thus was admissible. Memorandum *re* Clarification of *Kastigar* Opinion, Jan. 4, 1990, at 3–4; *see also* Memorandum *re* Testimony of Oliver North, Mar. 8, 1990, at 6–7; Opinion Denying Defendant's Motion for Judgment of Acquittal or for a New Trial, May 29, 1990, at 38; Transcript of *Kastigar* Hearing, Dec. 11, 1989, at 6–8. That a witness proffers a more detailed account than, or a rebuttal of, the defendant's immunized testimony may demonstrate "personal knowledge" in the evidentiary sense; but it simply does not rule out the possibility that the witness's memory was refreshed or influenced by the immunized testimony.

Whatever the exact contours of the district court's legal standard for "use" under § 6002, its view was clearly too narrow to

permit us to defer to its ultimate factual findings on this issue. We conclude below, moreover, that remand for new findings under the *North* standard, or for further hearings concerning taint, would be pointless because the record plainly demonstrates that the IC has neither met his burden of proof nor indicated that there might be any additional evidence that he could put forward in order to meet that burden.

### B. *North's Testimony*

■ The testimony of several of the witnesses may have been prejudicially influenced by their exposure to Poindexter's immunized testimony. The record is clear enough with regard to the admission of North's testimony, however, to compel reversal without regard to whether the testimony of any other witness was tainted.

North was extensively exposed to Poindexter's immunized testimony prior to either one's being tried. At Poindexter's *Kastigar* hearing North recounted:

I watched it on television as it happened. . . .

I reviewed what was written in the papers, and the clippings we had. I, of course, watched it on the newscasts as it was being given; and reviewed it with counsel in preparation for what we anticipated eventually happening.

Then we went through that entire process again as I prepared for my trial, so that we would be able to introduce evidence that we believed would be helpful to my defense.

Transcript *Kastigar* Hearing, Dec. 12, 1989, at 370–71. He had "spent literally days with the testimony as it happened, and then afterwards, and then again in preparation" for his trial. *Id.* at 379. When asked whether he could segregate the effects of his exposure on his current recollection, he stated, "I cannot tell you here today —nor could I have told you in my trial—that what I said was not the product of both having lived through [the events about which he was to testify] and having refreshed myself and having studied it very carefully." *Id.* at 178.

The trial court nevertheless permitted North to give testimony at Poindexter's trial that went well beyond any statements that had been canned prior to his exposure. In particular, the trial court ruled that North could—indeed, that he was required to—testify that Poindexter had destroyed the initial Presidential Finding, on the ground that he had so testified at his own trial:

[IC:] And you are certain, as you sit here before this jury, you know, do you not, that Finding you saw John Poindexter destroy, it was the Finding, the one signed by the President that had the politically embarrassing language in it, you know that, do you not?

[North:] I need help here.

The Court: Yes.

[North:] I am trying to remember your specific instruction to me as we started this, Your Honor, several days ago about certain aspects of other people's testimony.

The Court: Oh. Well, you better not go into other people's testimony. Just from what you know of your own knowledge. You were there.

[North:] Yes, I was.

[IC:] In your own trial did you testify very definitely what you saw him destroy was the one with the politically embarrassing language?

[North:] I did not have that same instruction in my trial, counsel.

[IC:] Your Honor, there has been a pretrial ruling on this matter.

The Court: In a pretrial ruling I have ruled that your testimony at your trial where you said you were present and saw him tear it up is the credible testimony, the only credible testimony you are giving on this subject and I want you to follow that up.

[IC:] Do you recall in your own trial testifying under oath that the finding you saw him destroy was very definitely the one that contained the politically embarrassing language?

[North:] Yes.

Trial Transcript, Mar. 12, 1990, at 1253–54.

Because the trial court applied its narrower standard for "use," it never made a finding that North's recollection (either at the time of his own trial or later at Poindexter's trial) was not refreshed or otherwise "shaped, altered, or affected" by his exposure to Poindexter's immunized testimony. And in view of North's immersion in that testimony (the effects of which he does not claim to be able to segregate), it would be clearly erroneous to hold that the IC met his "heavy burden," *Kastigar*, 406 U.S. at 461, 92 S.Ct. at 1665, of demonstrating that North's testimony was *not* influenced by Poindexter's immunized statements to the Congress. *See North II*, 920 F.2d at 944 (witnesses "might well testify that they simply were unable to determine just how much [the] exposure affected their testimony, in which case that uncertainty would surely be a grave problem for the party with the burden of proof—the prosecutor").

The IC argues that we must defer to the trial court's finding that North, out of loyalty to Poindexter, lied when he asserted that he was unable to segregate his own recollection from the effects of his exposure. The court would undoubtedly have been correct to reject as incredible an assertion, had North made it, that he remembered little or nothing of events in which he personally participated for more than a year. But Poindexter's claim—that there is a substantial likelihood that North's repeated exposure to his testimony in some way influenced North's recollection—is not nearly so implausible. *See North I*, 910 F.2d at 860–61 ("The District Court stated that '[t]here is no way a trier of fact can determine whether the memories of witnesses would be substantially different if [they] had not been stimulated by a bit of the immunized testimony itself'[.] ... The District Court found that such taint occurs in the 'natural course of events' because '[m]emory is a mysterious thing that can be stirred by a shaggy dog or a broken promise.' This observation [is] likely true.") (citations deleted). More to the point, even if North's assertion were to be given no

weight, the IC would still have failed to meet his burden, which is to demonstrate that the immunized testimony did *not* influence the witness. As we recognized in *North II*, where the prosecutor has failed to "can" testimony, "it may well be extremely difficult for the prosecutor to sustain its burden of proof that a witness exposed to immunized testimony has not shaped his or her testimony in light of the exposure." 920 F.2d at 943.

■ In *North II* we did not, to be sure, "mean to preclude the use of any techniques of which we [were] not aware" and by which the prosecution might be able to carry its burden. *Id.* Similarly, we now decline to adopt the suggestion of amicus American Civil Liberties Union that when a witness "has been thoroughly exposed to the defendant's immunized testimony ... [t]he only objective and reliable indicator that can *assure* that the defendant's immunized testimony was not used against him ..., as *Kastigar* demands, is to require that the witness' testimony be limited to that which the prosecution was able to 'can' prior to the exposure." We can and do say only that where a substantially exposed witness does not persuasively claim that he can segregate the effects of his exposure, the prosecution does not meet its burden merely by pointing to other statements of the same witness that were not themselves shown to be untainted. Such evidence is neither sufficient as a matter of first principles, nor the kind of unimagined "technique" we referred to in *North II*. *Cf. North II*, 920 F.2d at 944 (suggesting that if witness had set down his story before exposure, burden of going forward to challenge that version would shift to the defendant).

■ The IC has not suggested any other way in which he might meet his burden if we were to remand this case for further hearings regarding taint at trial. This is hardly surprising, though. The admissibility of North's testimony, including his testimony regarding the Presidential Finding, was hotly contested throughout the proceedings below. The IC had a full opportu-

nity and every incentive then to make any argument and offer any evidence tending to show that North's testimony was not influenced by his exposure. It is telling that instead the IC argued to the district court that if refreshment constituted "use," then that "would deprive the Government of critical evidence it lawfully is entitled to present," referring to "North's [trial] testimony concerning Poindexter's destruction of the signed 1985 Iran Finding[.]" Government's Dec. 21 Memorandum, at 12–16 & n. 7. *See also* Government's Closing Statement, Mar. 30, 1990, Transcript at 3169 (IC refers to the Finding in his closing argument as "the most critical piece of evidence" in the case), and Government's Rebuttal, Mar. 30, 1990, Transcript at 3325 (IC links Poindexter's destruction of the Finding to Poindexter's allegedly "lying" to Congress in Summer 1986 and November 1986).

█ The IC has not explained (in light, that is, of the standard for "use" set out in *North* ) what utility there would be in further hearings on North's testimony. *Cf. United States v. Hampton,* 775 F.2d 1479, 1491 & n. 54 (11th Cir.1985) (instructing district court to vacate conviction due to clear error in its conclusion that there was source for evidence independent of defendant's immunized testimony; appeals court's review of record shows "that a remand for a further evidentiary hearing would be unwarranted"). Therefore, Poindexter's immunized testimony having been used against him at trial through the testimony of witness North, his convictions on all counts must be reversed.

### C. *The Indictment*

█ Poindexter also contends that the indictment is tainted because witness testimony derived from his immunized statements was presented to the grand jury. *See North I,* 910 F.2d at 854, quoting *White Collar Crime: Fifth Survey of Law—Immunity,* 26 Am.Crim.L.Rev. 1169, 1179 ("If the tainted evidence was presented to the grand jury, the indictment will be dismissed"). This court has already found inadequate the procedures used to deter-

mine whether the indictments of Poindexter and North were tainted. *See North I,* 910 F.2d at 853–73; *North II,* 920 F.2d at 947–49. Thus, unless the IC proves on remand that the evidence received by the grand jury was untainted, or that any taint was harmless beyond a reasonable doubt, the indictment must be dismissed.

### III. SECTION 1505—COUNTS 2 AND 3

The obstruction statute under which Poindexter was charged in Counts 2 and 3, 18 U.S.C. § 1505, provides in relevant part:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication *influences, obstructs, or impedes or endeavors to influence, obstruct, or impede* the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or *the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House* or any joint committee of the Congress [s]hall be fined not more than $5,000 or imprisoned not more than five years, or both. [Emphases supplied.]

The indictment specifies that Poindexter "did corruptly influence, obstruct and impede" congressional inquiries by, among other things, making false and misleading statements to Members of the Congress. Because Poindexter does not argue that any of the other methods of violating § 1505 alleged in Counts 2 and 3 fall outside the scope of the statute and does not request any relief from the indictment, we do not rule upon any issues specific to Counts 2 and 3 other than the sufficiency of the allegations regarding false and misleading statements.

█ Poindexter challenges his § 1505 convictions on the ground that use of the term "corruptly" renders the statute unconstitutionally vague as applied to this conduct. That term must have some meaning, as we recognized in *North I,* 910 F.2d at 882, because otherwise the statute would criminalize all attempts to "influ-

ence" congressional inquiries—an absurd result that the Congress could not have intended in enacting the statute. The question in this case is whether the meaning it does have is sufficiently definite, as applied to the conduct at issue on this appeal, *viz.* lying to the Congress, to be the basis of a criminal conviction. "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. General Construction Company,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). In particular, a penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct it prohibits, and do so in a manner that does not invite arbitrary and discriminatory enforcement by which "policemen, prosecutors, and juries ... pursue their personal predilections." *Kolender v. Lawson,* 461 U.S. 352, 357–58, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983).

In response to certain different arguments that the defendant made unsuccessfully in *North I,* we quoted several modern dictionary definitions of the word "corrupt":

> "[C]orruptly" is the adverbial form of the adjective "corrupt," which means "depraved, evil: perverted into a state of moral weakness or wickedness ... of debased political morality; characterized by bribery, the selling of political favors, or other improper political or legal transactions or arrangements." A "corrupt" intent may also be defined as "the intent to obtain an improper advantage for [one]self or someone else, inconsistent with official duty and the rights of others."

*Id.* at 881–82 (citations omitted). Poindexter's argument is that with "corrupt" *so defined,* the term "corruptly" is vague as used in § 1505.

 We must acknowledge that, on its face, the word "corruptly" is vague; that is, in the absence of some narrowing gloss, people must "guess at its meaning and differ as to its application." More specifically, "corruptly influencing" a congressional inquiry does not at all clearly encompass lying to the Congress, which is, by way of contrast, clearly a violation of § 1001, the False Statements statute. Thus, in *Columbia v. Omni Outdoor Advertising,* —— U.S. ——, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), the Supreme Court recently said, in rejecting an argument that there should be a "conspiracy" exception to the antitrust immunity of municipal corporations:

> [A party] suggests ... that "conspiracy" might be limited to instances of governmental "corruption," defined variously as "abandonment of public responsibilities to private interests," "corrupt or bad faith decisions," and "selfish or corrupt motives." Ultimately, [the party] asks us not to define "corruption" at all, but simply to leave that task to the jury: "[a]t bottom however, it was within the jury's province to determine what constituted corruption of the governmental process in their community." ... A conspiracy exception narrowed along such vague lines is ... impractical. Few governmental actions are immune from the charge that they are ... in some sense "corrupt."

111 S.Ct. at 1352 (citations omitted). *See also Ricks v. District of Columbia,* 414 F.2d 1097, 1106–07 (D.C.Cir.1968), in which we held unconstitutionally vague a statute making it a crime to "lead[ ] an immoral or profligate life." "Immoral," and its synonyms "corrupt, indecent, depraved, dissolute," we noted, afford "an almost boundless area for individual assessment of the morality of another's behavior." *Id.* at 1106.

The various dictionary definitions of the adjective "corrupt" quoted in *North I* do nothing to alleviate the vagueness problem involved in attempting to apply the term "corruptly" to Poindexter's conduct. "Vague terms do not suddenly become clear when they are defined by reference to other vague terms." *Cartwright v. Maynard,* 822 F.2d 1477, 1489 (10th Cir.1987) (en banc), *aff'd,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); *accord Con-*

*nally,* 269 U.S. at 394–95, 46 S.Ct. at 128–29. Words like "depraved," "evil," "immoral," "wicked," and "improper" are no more specific—indeed they may be less specific—than "corrupt." *See, e.g., Walton v. Arizona,* — U.S. —, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990) ("no serious argument [that phrase] especially . . . depraved" is not too vague on its face to be an aggravating circumstance in capital sentencing); *Ricks,* 414 F.2d at 1106. (A dictionary definition quoted in *North I* also mentions "bribery" and the like, but no such conduct is at issue on this appeal.) As used in § 1505, therefore, we find that the term "corruptly" is too vague to provide constitutionally adequate notice that it prohibits lying to the Congress.

### A. *Legislative History*

Notwithstanding the use of the facially vague term, we suppose that if the legislative history of § 1505 clearly indicates a more specific meaning of the term "corruptly," then the statute might constitutionally be applied to conduct that comes within that meaning. *See Barenblatt v. United States,* 360 U.S. 109, 117–18, 79 S.Ct. 1081, 1088, 3 L.Ed.2d 1115 (1959) (in prosecution for contempt of Congress, House Rule authorizing investigation held not vague in light of "persuasive gloss of legislative history"); *Arnett v. Kennedy,* 416 U.S. 134, 162, 94 S.Ct. 1633, 1648, 40 L.Ed.2d 15 (1974) (legislative purpose gives content to "for cause" discharge standard) (opinion of Rehnquist, J. for three Justices); *id.* at 164, 94 S.Ct. at 1649 (accord) (opinion of Powell, J. for two Justices). In *North I* we stated that "[b]ecause Congress is not shown to have intended otherwise," "corruptly" should not be stretched beyond its "usual meaning" to incorporate either an "ignorance of the law" or an "authorization" defense. 910 F.2d at 881, 883–84; *id.* at 852 (summarizing holdings). *See also Perrin v. United States,* 444 U.S. 37, 42, 42–45, 100 S.Ct. 311, 314, 314–16, 62 L.Ed.2d 199 (1979) (looking to ordinary meaning of term at time of enactment to interpret criminal statute). Because we are now confronted with Poindexter's vagueness argument, which is compelling

when one considers only the statute on its face, it is time to consider whether the Congress "intended otherwise."

We pause first only to note that the verb "corrupt" may be used transitively ("A corrupts B," i.e., "A causes B to act corruptly") or intransitively ("A corrupts," i.e., "A becomes corrupt, depraved, impure, etc."). So too, the adverbial form "corruptly" may have either the transitive or the intransitive sense. *See* 3 Oxford English Dictionary 974 (2d ed. 1989) ("corruptly" may mean either "by means of corruption or bribery," i.e., by means of corrupting another, or acting oneself "in a corrupt or depraved manner"). On its face, § 1505 favors the transitive reading. The other terms in the disjunctive series in which it appears are "by threats," "[by] force," and "by any threatening letter or communication," all of which are transitive—indeed all of which take as their object a natural person. In addition, to read "corruptly" in an intransitive sense as "wickedly" or "immorally" would appear to render the other methods of violating the statute superfluous: surely the use of force to influence a congressional inquiry would always be "wicked" or at least "immoral."

Either a transitive or an intransitive interpretation would still be unconstitutionally vague, however, if more specific content is not given to the word "corruptly." Reading "corruptly" to prohibit one from influencing another to act "immorally" or "improperly" provides no more guidance than does reading it to prohibit one from acting "immorally" or "improperly" oneself. Narrowing the transitive interpretation to include only "corrupting" another person by influencing him *to violate his legal duty* would both take account of the context in which the term "corruptly" appears and avoid the vagueness inherent in words like "immorally." But that interpretation, which for convenience we shall refer to as the "subornation" interpretation of the statute, would not cover the conduct of Poindexter at issue on this appeal.

With all this in mind, we turn to the legislative history of the statute. We do so in search of a narrowing interpretation that

does apply to Poindexter's conduct (specifically, to lying) and that does so clearly enough to have put a reasonable person on notice that the statute applies.[1]

### 1. The Origins of § 1505 and § 1503

The core of the statute that is now § 1505 was passed in 1940. The terms of § 1505 were borrowed from a 1909 statute that has since become § 1503, an "obstruction of justice" statute not directly implicated in this case. The 1909 statute, codified at § 241 of the Criminal Code, read:

*Whoever corruptly, or by threats or force*, or by any threatening letter or communication, *shall endeavor to influence, intimidate, or impede any witness, in any court* of the United States or before any United States commissioner or officer acting as such commissioner, *or any grand or petit juror, or officer in or of any court* of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner, *in the discharge of his duty, or who corruptly or by threats or force*, or by any threatening letter or communication, *shall influence, obstruct, or imepde* [sic], *or endeavor to influence, obstruct, or impede, the due administration of justice therein*, [violates the statute].

Act of March 4, 1909, ch. 321, § 135, 35 Stat. 1113 (1909) (emphases supplied). That statute in turn derived from a similarly worded contempt statute of 1831. *See* Nelles & King, *Contempt by Publication in the United States*, 28 Colum.L.Rev. 401, 430–31 (pt. I), 525 (pt. II) (1928). There is some indication that the term "corruptly" in the 1831 and 1909 statutes was understood to apply to actions that "corrupted" another person, rather than to actions that manifested the actor's own "corrupt" nature:

[The] National Intelligencer (a newspaper whose reports formed the basis of the same publishers' Register of De-

bates) for Mar. 3, 1831, reports the following proceedings in the House on Mar. 2:

The Senate's Amendment to the Act declaratory of the powers of the Courts of the United States on the subject of contempts; adding a second section for punishing all attempts *to corrupt or intimidate jurors*, etc., was amended on the suggestion of Mr. Buchanan, and then agreed to.

*Id.* at 531 n. 24 (emphasis altered). *See also United States v. Russell*, 255 U.S. 138, 141, 143, 41 S.Ct. 260, 261, 65 L.Ed. 553 (1921) (using "corruptly endeavoring to influence" a juror and "corruption of a juror" interchangeably in construing § 241).

Section 241(a) the predecessor of § 1505, was passed in 1940 in order to supplement the prohibition of § 241 with a parallel provision applicable to conduct affecting proceedings before administrative agencies and the Congress. It followed the language of § 241 very closely:

That [1] whoever corruptly, or by threats or force, or by any threatening letter or communication, shall endeavor to influence, intimidate, or impede any witness in any proceeding pending before any department, independent establishment, board, commission, or other agency of the United States, or in connection with any inquiry or investigation being had by either House, or any committee of either House, or any joint committee of the Congress of the United States, or [2] who corruptly or by threats or force, or by any threatening letter or communication shall influence, obstruct, or impede, or endeavor to influence, obstruct, or impede [a] the due and proper administration of the law under which such proceeding is being had before such department, independent establishment, board, commission, or other agency of the United States, or [b] the due and proper

---

**1.** Our dissenting colleague suggests that as he would redefine the vague term corruptly—"i.e., acting in a manner inconsistent with a legal duty"—it is sufficiently clear to pass constitutional muster. Op. at 391–392. The question

before the court is not, however, whether we can now rewrite the statute to make it clear, but whether the defendant was fairly on notice of its meaning when he acted.

exercise of the power of inquiry under which such inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress of the United States [violates the statute].

Act of January 13, 1940, ch. 1, § 135(a), 54 Stat. 13 (1940).

Section 241(a) contained two clauses. The first covered influencing a witness in a proceeding before an administrative agency or either House or a committee of the Congress; note that this clause did not apply to an attempt to influence an officer (nor, of course, a juror). The second clause, which came later to be known as the "omnibus" clause, covered influencing [a] "the due and proper administration of the law" in a proceeding before an agency, and [b] "the due and proper exercise of the power of inquiry" by either House or a committee of the Congress.

The Senate and House Reports and the floor debates concerning § 241(a) focused almost exclusively upon the need to protect witnesses. Both reports state that the

> proposed legislation simply extends the protection now provided by law for witnesses in Court proceedings [under § 241], to witnesses in proceedings before either House of Congress or committees of either House (or joint committees), and to witnesses in proceedings before administrative agencies of the Government. The need of outlawing intimidation and corruption applies to every witness.

H.R.Rep. No. 1143, 76th Cong., 1st Sess. 1 (1939); S.Rep. No. 1135, 76th Cong., 1st Sess. 1 (1939).

On the floor of the House, the bill's sponsor stated that it "simply ... outlaws intimidation, coercion, and corruption of other witnesses, just exactly as existing law protects witnesses called to testify in courts." *See* 84 Cong.Rec. 9312 (1939) (Rep. Hobbs). References to the need to protect non-court witnesses were made throughout the debates in both chambers. *See id.* at 10526, 10910, 10911, 10912. There is no indication in the legislative history, however, that the law was meant to regulate the conduct of the witness himself when he testified before an agency or the Congress; only his oppressor (or corruptor) was affected by this section.

Indeed, when Senator Johnson objected that the language of the bill was broad and might "give to any board, any agency, or any department the right to do things that ought not to be done," Senator O'Mahoney, a member of the subcommittee to which the bill had been referred, assured him that the bill granted no power to the agencies. On the contrary, as a third Senator explained, the bill was meant to protect witnesses from congressional committees and boards who were "mercilessly muckrak[ing]" those witnesses. *Id.* at 10911. Senator O'Mahoney continued:

> I share completely the Senator's sympathy for the witness called before any group, and it is because I have such sympathy that I am urging passage of this bill. Let me give the Senator an example how it would work. At the present time, if a witness should be called before the Interstate Commerce Commission, some person not a witness before that Commission could with complete impunity threaten him that if he testified to the truth he would lose his job, for example, and there would be no recourse. This bill provides that, if any person should so threaten such a witness, such person would be guilty of a criminal offense[.] That is all the bill does.

*Id.* at 10912. Senator Johnson persisted: although a "logical" mind might give the bill that interpretation, he feared that the courts might read the bill to protect government departments, rather than witnesses. Once again Senator O'Mahoney answered that such an interpretation was unwarranted. *Id.* Similarly, in the House, when Rep. Celler was asked whether the bill contained any clause that would "in any way restrict the rights of any witness appearing before any committee of the Congress," he replied, "None whatsoever." *Id.* at 10526.

In sum, there is no indication that the Congress believed that the second or omni-

bus clause of § 241(a) would, by way of its "corruptly" language (or otherwise), make criminal a witness' violation of his own legal duty or "in any way restrict the rights of any witness appearing before any committee of the Congress." *Id.*

In 1948, § 241(a) was recodified at 18 U.S.C. § 1505, under the heading "Influencing or injuring witness before agencies and committees," Act of June 25, 1948, ch. 645, 62 Stat. 770 (1948), which heading was changed in 1962 to "Obstruction of proceedings before departments, agencies, and committees," Antitrust Civil Process Act, 76 Stat. 551 (1962). Minor alterations in wording and other amendments of no apparent relevance to the issue under consideration occurred both before and after the 1948 codification.

### 2. The Witness Protection Act of 1982

The Victim and Witness Protection Act of 1982 created a new provision, § 1512, which prohibits various forms of witness tampering, including many activities that were formerly prohibited by §§ 1503 and 1505. In order to effect that transfer, the Act also deleted the word "witness" from § 1503 and deleted the first clause (prohibiting corruptly etc. influencing etc. a witness) from § 1505. It left the omnibus clause of each statute intact.

The Senate Report contains a number of statements reflecting the Judiciary Committee's understanding of §§ 1503 and 1505 as they then were and would continue to be even if the Senate bill passed:

> Current law requires a relatively high threshold of seriousness for commission of a crime. For instance, section 1503 requires corruption, threats or force as elements as [sic] the offense of influencing a witness. [It does not] proscribe conduct knowingly and maliciously hindering, delaying, preventing or dissuading testimony.

S.Rep. No. 532, 97th Cong., 2d Sess. 14 (1982). Similarly, the report stated that "verbal harassment" was not covered under § 1503, "which requires corruption, threats or force for an offense." *Id.* at 15. These statements strongly suggest that, at

least as used in § 1503 but presumably also in § 1505, "corruption" is something more specific than simply "any immoral method used to influence a proceeding."

The original Senate version of § 1512 contained its own omnibus clause, which closely paralleled the language of §§ 1503 and 1505:

> (a) Whoever ... (3) corruptly, by threats or force, or by any threatening letter of [sic] communication, intentionally influences, obstructs or impedes, or attempts to influence, obstruct or impede the (A) enforcement and prosecution of Federal law; (B) administration of a law under which an official proceeding is being or may be conducted; or (C) exercise of a Federal legislative power of inquiry [violates the statute].

128 Cong.Rec. 26,360 (1982). The Senate Report explained the purpose of this clause:

> ["]The obstruction of justice statute is an outgrowth of Congressional recognition of the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined. [" (quoting *Catrino v. United States*, 176 F.2d 884, 887 (9th Cir.1949)]
>
> In the Committee's view, this observation leads to the conclusion that the purpose of preventing an obstruction or miscarriage of justice cannot be fully carried out by a simple enumeration of the commonly prosecuted obstruction offenses. There must also be protection against the rare type of conduct that is the product of an inventive criminal mind and which also thwarts justice.

S.Rep. No. 532, 97th Cong., 2d Sess. 18 (1982) U.S.Code Cong. & Admin.News 1982, pp. 2515, 2524. The report listed some examples of behavior "actually prosecuted under the current residual"—presumably omnibus—"clauses, which would probably not be covered in this series without a residual offense clause," such as a co-conspirator's arranging to have an "unnecessary abdominal operation" in order to cause a mistrial.

The Committee does not intend that the doctrine of *ejusdem generis* be applied to limit the coverage of this subsection. Instead, the analysis should be functional in nature to cover conduct the function of which is to tamper with a witness, victim, or informant in order to frustrate the ends of justice. For example, a person who induces another to remain silent or give misleading information to a Federal law enforcement officer would be guilty under subsection (a)(3), irrespective of whether he employed deception,[2] intimidation, threat, or force as to the person.

The first branch of the proposed subsection, [§ 1512(a)(3)(A)] referring to the "enforcement and prosecution of federal law" is designed to carry forward the basic coverage in 18 U.S.C. 1503. The latter two branches of the subsection, [§ 1512(a)(3)(B) and (C)] referring to the "administration of a law under which an official proceeding is being conducted" and to the "exercise of a legislative power of inquiry," are designed to continue the general scope of the final paragraphs of 18 U.S.C. 1505.

*Id.* at 18–19.

Had the omnibus subsection of § 1512 been enacted as passed by the Senate, the quoted statements and examples would still be of uncertain import for § 1512 (and for §§ 1503 and 1505). On the one hand, with respect to the proposed omnibus clause of § 1512, the Report seems to reject the *"ejusdem generis"* construction that had caused some courts to narrow the reach of the omnibus clause of § 1503, *see, e.g., United States v. Metcalf,* 435 F.2d 754, 757 (9th Cir.1970), but it does not suggest that those courts had erred or that § 1503 should be amended. On the other hand, the Report interprets the subsection as being limited to activities "the function of which is to tamper" with someone else. This is important because the proposed omnibus clause did not contain such an express limitation; it merely adopted the "corruptly, by threats or force" formula of §§ 1503 and 1505.

In any event, however, the omnibus clause of § 1512 was not enacted. After the Senate had passed its version, the House debated that bill together with its own victim protection bill. A section-by-section analysis of the House bill indicates that the House Judiciary Committee was also aware that some courts were interpreting § 1503 narrowly. 128 Cong.Rec. 26,350 (1982). The analysis cites *Metcalf,* 435 F.2d 754 (applying the *ejusdem generis* rule and stating that "the manner in which the statute may be violated would ordinarily seem to be limited to intimidating actions," *id.* at 757), and *United States v. Essex,* 407 F.2d 214 (6th Cir.1969) (holding that § 1503 is not violated merely by making a false statement, *id.* at 217–18). Nonetheless, neither the bill that passed the House nor the compromise bill that was ultimately enacted criminalizes a witness's violation of his own legal duty (e.g., by lying to the tribunal). (As enacted § 1512 prohibited only using intimidation or physical force against, threatening, or "engag[ing] in misleading conduct toward" another person in order to cause that person to withhold or to alter testimony or documents. Victim and Witness Protection Act of 1982, 96 Stat. 1248, 1249 (1982)).

The House passed the Senate bill, as "amended" by substituting the text of the House bill. 128 Cong.Rec. 26,363 (1982). The House and Senate then compromised the differences between their versions, but the resulting statute did not contain an omnibus clause, as had the original Senate version. On the floor, Senator Heinz noted that

> Subsection (3) of section 1512(a) of the Senate passed bill, general obstruction of justice residual clause of the intimidation section, was taken out of the bill as beyond the legitimate scope of this witness protection measure. It also is probably duplicative of abstraction [sic] of justice statutes already on the books.

128 Cong.Rec. 26,810 (1982).

On balance, the legislative history seems to support the transitive interpretation of

---

**2.** Section 1512 as enacted prohibits misleading a person in order to cause him to alter or with-

hold testimony or documents. It does not prohibit misleading the tribunal itself.—D.H.G.

"corruptly" in § 1505; not surprisingly, counter-indications as well appear in the course of its evolution from 1831 to the present. One thing is clear, however: the legislative history gives no better notice than does the statutory text that lying to or misleading a Member of the Congress (or an agency) violates § 1505. If anything, the 1940 legislative history suggests that such behavior is excluded from the scope of that section.

### B. *Judicial Interpretation of § 1505*

Neither has the statute been sufficiently clarified by prior judicial decisions to give the requisite notice and to protect against "prosecutors, and juries ... [who] pursue their personal predilections," *Kolender*, 461 U.S. at 358, 103 S.Ct. at 1858. *Cf. Smith v. United States*, 431 U.S. 291, 308–09, 97 S.Ct. 1756, 1767–68, 52 L.Ed.2d 324 (1977) (obscenity statute not vague in light of prior Supreme Court obscenity precedents). The circuit decisions closest in point hold only that § 1505 does reach certain arguably similar conduct, *viz.* giving "blatantly evasive" answers by "feign[ing] forgetfulness," *United States v. Alo*, 439 F.2d 751, 754 (2d Cir.1971), and falsifying or concealing documents, *United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir.1976); *see also United States v. Laurins*, 857 F.2d 529, 536–37 (9th Cir.1988), which post-dates Poindexter's alleged conduct.

It is not possible to extrapolate from a case holding that a particular act is within the scope of the statute in order to determine whether a different act is also covered unless the court provides a coherent principle for inclusion or exclusion. The cited cases simply do not contain sufficiently clear—or consistent—reasoning to permit such an extrapolation. Neither *Vixie* nor *Alo* examines either the meaning of the term "corruptly" or the legislative history of § 1505. Indeed, in *Vixie* there is but one unenlightening sentence rejecting the defendant's argument that "submitting a false document is not a violation of 18 U.S.C. § 1505, where ... the conduct violates 18 U.S.C. § 1001." 532 F.2d at 1278.

The discussion in *Alo* is more detailed but equally unhelpful. Rather than analyze the meaning of the term "corruptly," the court relies upon the defendant's concession that concealing documents is within § 1505 to infer that giving "evasive" answers must also violate the statute: "[the defendant's theory] would produce the anomalous result that concealing information recorded in one's papers would constitute ... an offense under § 1505, but concealing data recorded in one's memory would not. No rational basis for differentiating between these types of evidence has been suggested to us, and without a clear statement of contrary Congressional intent we cannot attribute such an arbitrary distinction to the legislature." 439 F.2d at 754. The court did not question the validity of the defendant's concession. Nor did it consider the plausible interpretive principle later suggested by the Third Circuit in *United States v. Walasek*, 527 F.2d 676 (1975), which would indeed bring document alteration but not evasive testimony within the condemnation of the statute. *See* 527 F.2d at 679 & n. 14.

Moreover, the *Alo* court itself characterized the statements made by the defendant, *viz.* 134 claims of lapsed memory, as "evasive" rather than false. 439 F.2d at 753–54. "[T]he gist of [the] offense was not the falsehood of his statements, but the deliberate concealment of his knowledge.... [The] profession of forgetfulness was not so much false testimony as a refusal to testify at all." *Id.* at 754. *See also id.* at 754 n. 4; *United States v. Griffin*, 589 F.2d 200, 203–04 (5th Cir.1979) (applying § 1503 to evasive statements, while declining to rule upon situation in which defendant's testimony is "merely false"); *id.* at 205 (defendant's testimony "did not merely require the grand jury to ascertain the truth by resolving contradictory evidence; his denial of knowledge had the effect of closing off avenues of inquiry entirely"). Our point is not to sanction the false versus evasive distinction stressed in *Alo*, but to highlight the difficulty of extrapolating from that § 1505 case to Poindexter's alleged conduct.

Nor are cases construing § 1503 instructive in this regard. *See* cases cited in Annotation, *Construction and Application of 18 U.S.C.S. § 1503*, 20 A.L.R.Fed. 731 §§ 17, 18 (1974 and Supp.1990); cases cited in 18 U.S.C.A. § 1503 (West 1984 & Supp.1991), notes of decisions 8, 13. A clear interpretation of a similarly worded statute, widely adopted and consistently applied, might shield a facially ambiguous statute from a vagueness attack. That is not the situation here, however. Courts construing § 1503 have adopted a wide variety of interpretations, *see North I*, 910 F.2d at 940–41 & n. 14 (Silberman, J., separate opinion) (citing cases). In any event, the language of § 1505 is materially different from that of § 1503, and has been different from the beginning, when § 241(a) was enacted alongside § 241.

Courts that have rejected the *ejusdem generis* interpretation, which limits the reach of § 1503 to conduct influencing another person, have done so because that "reading of the statute renders the omnibus clause superfluous," *United States v. Howard*, 569 F.2d 1331, 1333 (5th Cir.1978). For example, in *Walasek*, 527 F.2d at 679 n. 11, the court stated:

> Appellant's argument is that the last part of § 1503 should be limited to efforts to influence, obstruct or impede the due administration of justice which are directed against individuals. Yet the earlier, specific, prohibitions of § 1503 [influencing witnesses, grand or petit jurors, or officers "in or of" any court] pretty well exhaust such possibilities.

*See also Griffin*, 589 F.2d at 203. A parallel construction of § 1505 does not create this difficulty. If the concept of acting "corruptly" in the omnibus clause of § 1505 applies only to "efforts to influence, obstruct or impede [the due administration of the law or the due exercise of the power of inquiry] which are directed against individuals," the clause still adds to the coverage of the statute. For § 1505, unlike § 1503, has never expressly prohibited efforts to influence an "officer" whose responsibility it is to "duly administer" the law or "duly exercise" the power of inquiry, such as an agency official or employee, a Member of the Congress or of the congressional staff. The omnibus clause of § 1505 would still serve to criminalize corrupting, threatening, or coercing those persons.

Nevertheless, we need not conclude that the ambiguity of the term "corruptly" in § 1505 renders that term unconstitutionally vague as applied to all conduct. The legislative history we have reviewed may not mandate the "subornation" interpretation of § 1505, which would reach only a person who, for the purpose of influencing an inquiry, influences another person (through bribery or otherwise) to violate a legal duty. Still, that interpretation may be useful as a description of the "core" behavior to which the statute may constitutionally be applied. *See Smith v. Goguen*, 415 U.S. 566, 578, 94 S.Ct. 1242, 1249, 39 L.Ed.2d 605 (1974); *United States v. Harriss*, 347 U.S. 612, 618, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954) ("if the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague, even though marginal cases could be put where doubts might arise"); *United States v. Maude*, 481 F.2d 1062, 1068–69 (D.C.Cir.1973). Many interpretations of the statutory language in general, and of the term "corruptly" in particular, have been suggested, but most converge upon such behavior. *See also United States v. Haldeman*, 559 F.2d 31, 115 n. 229 (D.C.Cir.1976) (approving instruction for § 1503 charge in which trial judge stated that "[i]f you find ... that a Defendant participated in the payment of money to the original Watergate defendants for the purpose of keeping them quiet, you would be justified in finding that a corrupt endeavor to obstruct the due administration of justice occurred").

The core interpretation of § 1505 would be narrower still if, as some have suggested, "corruptly" means that in acting, the defendant aimed to obtain an "improper advantage for [himself] or someone else inconsistent with official duty and rights of others." *See North I*, 910 F.2d at 881–82 (quoting Ballentine's Law Dictionary 276 (3d ed. 1969)); *accord United States v.*

*Reeves,* 752 F.2d 995, 999–1001 (5th Cir. 1985). Then someone who influences another to violate his legal duty has not acted corruptly if his purpose is, for example, to cause the enactment of legislation that would afford no particular benefit to him or anyone connected with him. Or, as the Chief Judge instanced at the oral argument of this case, there "would be some purposes that would be corrupt and some that wouldn't be.... [S]uppose the [defendant acted] to protect the historical reputation of some historical figure that has been dead for 20 years and he decides that he doesn't want to mar that person's reputation."

In any event, we do not now decide whether material advantage to the defendant is a necessary element of the core behavior to which § 1505 may constitutionally be applied. Even if that statute may constitutionally be applied to all attempts to influence or to obstruct a congressional inquiry by influencing another to violate his legal duty, it would still not cover the conduct at issue on this appeal—making false and misleading statements to the Congress.

In sum, neither the legislative history nor the prior judicial interpretation of § 1505 supplies the constitutionally required notice that the statute on its face lacks. Accordingly, we find no reason to disturb our earlier conclusion that the statute is unconstitutionally vague as applied to Poindexter's conduct.

### IV. SECTION 1001—COUNTS 4 AND 5

Poindexter also argues that 18 U.S.C. § 1001 does not apply to a false but unsworn and untranscribed oral statement made by an official of the Executive Branch to Members of the Congress acting in their "legislative capacity."

Section 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

The language of § 1001 is very broad and, as Poindexter concedes, appears by its terms to cover the conduct charged. Moreover, the Supreme Court has repeatedly held, in a great variety of circumstances, that the proper interpretation of § 1001 is correspondingly broad. *E.g., United States v. Rodgers,* 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984); *United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955).

This court has previously held that a congressional committee is a "department" for purposes of § 1001. *See United States v. Hansen,* 772 F.2d 940, 943–44 (D.C.Cir. 1985) (forms submitted by congressman to House Committee as required by Ethics in Government Act involve "matter within the jurisdiction of [a] department [etc.]"). Poindexter, however, distinguishes *Hansen* as involving only a "housekeeping" rather than a "legislative" function of the Congress. In support of this distinction, he points out that many courts have recognized an analogous "judicial function" exception, making § 1001 inapplicable to conduct occurring before a court acting in its judicial capacity.

The judicial function exception traces to a dictum in *Morgan v. United States,* 309 F.2d 234 (D.C.Cir.1962), the holding of which is that § 1001 does apply to one who practiced law by "falsely [holding] himself out to be" another person and member of the bar. *Id.* at 235, 237. We relied upon Supreme Court precedent to conclude that a court could be a "department" for purposes of § 1001, but also cautioned that the Congress did not intend that the statute apply to "traditional trial tactics." *Id.* at 237 (citing *Bramblett,* 348 U.S. at 509, 75 S.Ct. at 508). We viewed the acts charged, however, as involving the court's "administrative" or "housekeeping" functions, rather than the "'judicial' machinery of the court." *Id.*

A number of courts, relying upon the *Morgan* dictum, have actually held that there is a "judicial function" exception to § 1001. *United States v. Mayer*, 775 F.2d 1387, 1388–92 (9th Cir.1985) (§ 1001 does not cover submission of fictitious letter of recommendation to sentencing court); *United States v. Abrahams*, 604 F.2d 386, 392–93 (5th Cir.1979) (answering magistrate falsely regarding aliases and arrest record at bail hearing not covered by § 1001); *United States v. Erhardt*, 381 F.2d 173, 175 (6th Cir.1967) (submission of falsified receipt into evidence not a violation of § 1001); *see also United States v. Holmes*, 840 F.2d 246, 248–49 (4th Cir.1988) (recognizing in a dictum judicial function exception, but holding that receiving from defendant false name and consent form to proceed thereunder is within court's administrative function); *United States v. Rowland*, 789 F.2d 1169, 1172 (5th Cir.1986) (submission of forged bond within administrative function of bankruptcy court and thus subject to § 1001 prosecution).

Poindexter maintains that the rationale for the judicial function exception equally supports an exception for the legislative function. First, he argues that the Congress, like a court, has other ways in which to protect itself against false statements; for example, it can force a person to testify under oath, thus subjecting him to the risk of prosecution for perjury if he lies. Second, he contends that application of § 1001 to the legislative context would chill "private discussion between representatives of the political branches." The latter problem is exacerbated, he argues, when § 1001 is applied to an untranscribed statement made by a person not under oath.

 We are not persuaded to carve out a broad legislative function exception to § 1001. The *Morgan* dictum and apparently the subsequent opinions of other circuits are grounded primarily upon the concern that the statutory terms "conceals or covers up" not be applied to punish "traditional trial tactics":

Does a defendant cover up ... a material fact when he pleads not guilty? Does an attorney cover up when he moves to exclude hearsay testimony he knows to be true, or when he makes a summation on behalf of a client he knows to be guilty?

*Morgan,* 309 F.2d at 237 (internal quotation marks omitted). *See Mayer,* 775 F.2d at 1389 ("In reading *Morgan,* we sense a concern that applying section 1001 to positions taken before a court during litigation could inhibit vigorous advocacy of parties' interests, particularly those of a defendant in a criminal case."); *United States v. Plascencia–Orozco,* 768 F.2d 1074, 1076 (9th Cir. 1985) ("No trial strategy would justify the misrepresentation of the identity of the defendant" to the magistrate); *Holmes,* 840 F.2d at 248 n. 3; *Abrahams,* 604 F.2d at 392–93; *Erhardt,* 381 F.2d at 175; *cf. Bronston v. United States,* 409 U.S. 352, 357–60, 93 S.Ct. 595, 599–601, 34 L.Ed.2d 568 (1973) (federal perjury statute does not reach an answer that is "literally true" even if witness intends to mislead).

Although some of the other courts of appeals have since expanded upon the *Morgan* dictum, *e.g., Mayer,* 775 F.2d 1387, we have not, and we doubt that the "traditional trial tactics" rationale of that case shields from criminal responsibility a defendant who knowingly makes a material false statement of fact in a judicial proceeding. We see no reason, therefore, to extend the putative "judicial function" exception to protect one who knowingly makes a material false statement of fact in the course of a legislative inquiry. *See Mayer,* 775 F.2d at 1392 (Fairchild, concurring) ("virtually none of the significant decisions has really defined the [judicial function] exception [or] expounded a rationale," and there is no "compelling reason for extending the exception beyond the exact holdings" of prior cases).

 Poindexter also argues that § 1001 should not apply to "private discussions between representatives of the political branches where, as here, no oath is administered and no verbatim transcript is maintained." In such circumstances, "proof literally becomes a matter of one person's word against another, even though neither may have heard or remembered with precision exactly what form of words was used

in making an allegedly false statement." We have already held, however, that § 1001 may be applied to "statements [that were] not under oath [and were] not stenographically transcribed." *See Marzani v. United States*, 168 F.2d 133, 141 (D.C.Cir.), *aff'd by an equally divided court*, 335 U.S. 895, 69 S.Ct. 299, 93 L.Ed. 431 (1948). The absence of such formal trappings is relevant, of course, to the difficulty of proving beyond a reasonable doubt exactly what the defendant said and whether he intended to deceive his audience as to a material question of fact; but these are issues of the sufficiency of the evidence in a particular case, not reasons for carving a categorical exception from the statute.

 Nor is our understanding of the statute altered because the false statement is made in a meeting between representatives of the political branches. Section 1001 requires that the statement be made to a government department; that it was here also made by the representative of another government department adds a political dimension to the relationship between speaker and auditor.

Poindexter correctly points out that "[i]nformal powers and protections ... play a significant role" in the ongoing relationship between the political branches. "[A]n Administration or administrative official who lies to Congress can lose the political and personal trust that is essential to the effective operation of government at its highest levels." But that is hardly a reason for believing that the Congress did not intend that § 1001 also be applied to an Executive Branch representative who bears false witness before it; indeed, the contrary implication is more plausible. *See Hansen*, 772 F.2d 940 (§ 1001 applies to false financial disclosure report filed, pursuant to Ethics in Government Act, with House Committee). *But cf. id.* at 943, n. 1 ("One hundred twenty-three members of Congress filed an *amicus* brief arguing that Congress did not intend criminal sanctions to attach to EIGA violations.").

## V. CONCLUSION

Because the IC has failed to show that Poindexter's immunized testimony was not used against him at trial, we reverse the convictions on all counts. The convictions for violations of § 1505 are also reversed on the ground that the statute cannot constitutionally be applied to some of the conduct alleged in Counts 2 and 3 of the indictment. The case is remanded to the district court for such further proceedings on the indictment as the IC may pursue.

*So ordered.*

MIKVA, Chief Judge, dissenting in part:

In *United States v. North*, this Court changed the standards the special prosecutor had to meet; today we refuse to let him try to meet them.

*Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1971), requires trial judges to determine whether testimony in court is tainted by immunized testimony before Congress. For many years, many judges met the burdens of *Kastigar* by reviewing suspect testimony in *ex parte* hearings. In the *North* case, however, we found that the trial judge could meet his burden only after conducting an "open adversary hearing." *See United States v. North*, 910 F.2d 843, 867 ("North I"), *modified* 920 F.2d 940, 944 (D.C.Cir.1990) ("North II"). The *North* decision also expanded the scope of 18 U.S.C. § 6002 by holding that a prohibited "use" occurs whenever a witness's testimony is in any way "shaped, altered, or affected" by immunized testimony. *See North I*, 910 F.2d at 863. We remanded the *North* cases, accordingly, to let the trial judge consider our new formulation of the *Kastigar* burden by reviewing the testimony "line-by-line and item-by-item." *Id* at 872. The majority now declares that a similar remand would be "pointless" in John Poindexter's case, Maj. Op. at 374–375, even though this court has not given this trial judge a chance to apply the new construction of *Kastigar*.

As a practical matter, of course, the special prosecutor's recent decision to abandon his case against Oliver North suggests that the new burdens are hard to meet. But the

decision to prosecute belongs to the prosecutor, and the decision to dismiss belongs to the trial judge, and today this Court usurps their authority by denying them the chance to exercise it.

My quarrel is not with the more rigid approach to *Kastigar* enunciated in the *North* decisions. Indeed, I think it appropriate that Congress should be forced to weigh the potential consequences of using its investigative authority against the imperilment of individual criminal prosecutions. In any event, *North* is the law of this Circuit, if not of the country, and we are bound to apply it.

I quarrel strenuously, however, with the almost casual way in which this court has thrown aside the lengthy and careful attempts by our trial judges to do their job. Respect for the difficulties experienced by a trial judge in trying to determine the applicable law ought cause a reviewing court to shun the result we proclaim today.

The majority refuses to remand because it finds nothing in the record to support a finding that the prosecution met its burden of proof under *Kastigar* and because the prosecution failed to identify additional evidence that would satisfy this burden. *See* Maj.Op. at 375. However, this court is not in a position to say that the district court could not conclude, after a full hearing applying the appropriate standard, that the prosecution has satisfied its burden. Indeed, I find that the trial court could very well conclude, on remand, that the special prosecutor has met his burden under *North*'s reading of *Kastigar.*

Under *Kastigar,* the prosecution must show that it has a legitimate source of evidence "wholly independent" of any compelled testimony. *See Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1665. Furthermore, *North* requires that the prosecution demonstrate that any offered testimony is not "shaped, altered, or affected," in any way by immunized testimony. *See North I,* 910 F.2d at 863. I find that North's testimony under oath at his own trial clearly would meet this rigid standard. North's testimony related to events he lived through and of which he had personal knowledge with-

out any reference to Poindexter's testimony. Some of his testimony simply tracked what he told Congress *before* Poindexter testified.

The majority disagrees, concluding that, in light of North's exposure to Poindexter's immunized testimony and his statement that he could not segregate the effects of that exposure, it would be "clearly erroneous" for a trial judge to hold that the independent counsel has met its burden of showing that immunized testimony did not influence North. Maj.Op. at 376. In support of this conclusion, the majority points to this court's statement in *North II* that a "grave problem" for the prosecutor arises when a witness testifies that he is "unable to determine just how much exposure affected [his] testimony." *See* Maj.Op. at 376 (citing *North II,* 920 F.2d at 944). But this statement necessarily assumes that the trial judge *believes* the witness when he says he cannot segregate the effects of the immunized testimony—and the trial judge here did *not* believe Colonel North.

At his own trial, North was required to testify, under oath, subject to penalty for perjury, about what he knew personally, not about what someone told him he knew. I find it strange that he now claims he cannot separate what he knows through his memory and experiences from what he heard Poindexter say. More importantly, the district court rejected Colonel North's statement as "totally incredible." *See* Memorandum *re* Testimony of Oliver North, Mar. 8, 1990, at 10. I would defer to the trial judge's finding regarding Colonel North's credibility.

As the majority points out, there is no way for a trier of fact (or anyone else for that matter) to infiltrate the mind of a witness and determine whether his memory would be substantially different if he had not been exposed to immunized testimony. *See* Maj.Op. at 376 (quoting *North I,* 910 F.2d at 860–61). But this court concluded in *North I,* that it still may be possible for the trial court to "separate the wheat of [North's] unspoiled memory from the chaff of [Poindexter's] immunized testimony...." *See North I,* 910 F.2d at 862.

More importantly, this determination should be made by the trier of fact after a full *Kastigar* hearing, not by this court on appeal. *See North I,* 910 F.2d at 867 ("an ex parte review in appellate chambers is *not* the equivalent of the open adversary hearing contemplated by *Kastigar*"). The respect that the *North* court gave to the authority of the prosecutor and the trial judge makes our decision to usurp their authority today all the more puzzling. Because the trial court never had a chance to apply this court's new *Kastigar* standards properly, we should remand this issue to give him the chance to determine whether the prosecution can meet them.

The majority contends that, even ignoring North's statements about his testimony, the prosecution has still failed to meet its burden of demonstrating that Poindexter's immunized testimony did not influence witnesses. *See* Maj.Op. at 376. But once again, the prosecution has never had an opportunity to try to meet its new burden.

Obviously, a ruling by the district court discounting North's statements regarding taint would merely put the prosecution back to square one, still facing, without the benefit of canned statements, the "extremely difficult" task of proving that immunized testimony was not used against Poindexter. *See North II,* 920 F.2d at 943. But this court held in *North II* that while canned testimony is *one* recognized method of satisfying the prosecution's burden, this does not "even mean to suggest that the prosecutor [is] barred from trying to show in *any* fashion that a witness' testimony was not influenced by the immunized testimony." *See id.* at 943 (emphasis added). The fact that the independent counsel has a difficult burden to meet does not mean that we must deprive him of the opportunity to try.

The holding that the majority announces today proclaims a very troubling guideline: "where a substantially exposed witness does not persuasively claim that he can segregate the effects of his exposure, the prosecution does not meet its burden merely by pointing to other statements of the same witness that were not themselves shown to be untainted." *See* Maj.Op. at 376. Under this standard, apparently, as soon as a witness claims to have trouble remembering what he knew before he was exposed to immunized testimony, all of his own testimony is presumptively tainted unless the prosecution can show that it is not. The Court today tells future defendants that all they need to evade responsibility is a well timed case of amnesia.

There is another issue in the majority opinion that gives me great pause. The majority reads the word "corruptly" as it applies to Poindexter's behavior alleged in Count III of the indictment in a very peculiar way. Count III alleged that Poindexter corruptly obstructed congressional investigations into arms sales to Iran by preparing a false chronology indicating that U.S. officials did not know of the November 1985 missile transfers until January 1986; by stating in meetings with the House and Senate Intelligence Committees that he did not learn of the November 1985 missile deal until January 1986; by telling the House Intelligence Committee that he did not learn until November 20, 1986 (the day before the meeting) that any U.S. official had prior knowledge of the 1985 transfer; and by deleting certain messages sent or received by him from an NSC computer system. Count III claimed that Poindexter's action violated 18 U.S.C. § 1505 which establishes criminal penalties for anyone who obstructs agency investigations or who "corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes ... [a congressional investigation]." 18 U.S.C. § 1505 (emphasis added).

It seems obvious to me that Poindexter "corruptly" obstructed the congressional investigation when he lied to Congress. But after consulting the Oxford English Dictionary, the majority has decided that the statute does not mean what it says, and instead is unconstitutionally vague. Invoking a confusing distinction between what it calls the "transitive" and the "intransitive" meanings of the word "corruptly," the majority concludes, in effect, that Congress intended to punish those who obstruct justice by inducing others to lie under oath,

but did not intend to punish those who obstruct justice by lying on their own initiative. This strikes me as odd. As we recognized in *North I,* "[i]n general, common words in statutes should be given their common or popular meanings, in the absence of congressional definition." 910 F.2d at 881.

Instead of taking the words of the statute at their face value, the majority strains to adopt a transitive definition of "corruptly" as acts that influence others to violate a legal duty. The plain language of the statute just as easily supports an intransitive definition of "corruptly" as acts that violate one's own legal duty. This reading is not unconstitutionally vague, and nothing in the legislative history is inconsistent with it. As the majority points out, either a transitive or an intransitive reading of section 1505 would be unconstitutionally vague unless the word "corruptly" is given a more specific meaning. *See* Maj.Op. at 379. By requiring an allegation that the conduct is in violation of a legal duty, the majority suggests that the vagueness in the term would be removed. *See* Maj.Op. at 379. But while "corruptly" cannot be read to criminalize all attempts to influence Congress, there is a clear distinction between politically misleading (but literally true) advocacy and outright lying. No matter how devious the intent, a mere act of lobbying or otherwise seeking to persuade an official cannot fall under the definition of "corruptly" in the context of section 1505, since advocacy is not "inconsistent with a legal duty." As we recognized in *North,* executive personnel "constantly attempt, in innumerable ways, to obstruct or impede congressional committees" as part of "legitimate political jousting between the executive and legislative branches." *See North I,* 910 F.2d at 882.

But the conduct alleged in Count III was not "political jousting." Poindexter *lied* to Congress about the existence of the first Presidential finding and then later destroyed it. This was a clear violation of his oath of office, his oath to Congress, and his duty not to lie. Count II does sound very much like the political positioning that would stretch the statutory terms beyond

constitutional limits, and I concur in the judgment as to that count. But the conduct described in Count III is of a different stripe altogether. The allegations in Count III fall within the plain meaning of the term "corruptly," and I would uphold Poindexter's conviction on that count.

Looking at the words of the statute, I see no reason to narrow them to their transitive meaning. A person can violate section 1505 by corruptly (i.e. acting in a manner inconsistent with a legal duty) obstructing, influencing, or impeding a congressional inquiry; a person can violate the statute by using threats in a manner that obstructs, influences, or impedes a congressional inquiry; and a person can violate the statute by using force to obstruct, influence, or impede a congressional inquiry. None of these uses is inconsistent with the statute and none involves a defendant influencing *another* person to violate his legal duty in a manner that obstructs a congressional inquiry. The majority concludes that the statute favors only a transitive reading because the other terms, "by threats," "by force" and "by threatening letter or communication," are all transitive and take as their object a natural person. *See* Maj.Op. at 379. I cannot imagine, however, that Congress meant to prohibit attempts to obstruct justice by influencing someone else to violate a legal duty, but did not mean to prohibit attempts to obstruct justice by violating one's own legal duty.

Since I believe that section 1505 is clear on its face, there is no need to look to any legislative history. I note, however, that nothing in the legislative history is inconsistent with using the intransitive definition of "corruptly" given by this court in *North I:* acting with "the intent to obtain an improper advantage for [one]self or someone else, inconsistent with official duty and the rights of others." *See North I,* 910 F.2d at 881–82.

The 1940 predecessor to section 1505 contained two clauses: clause [1] addressed efforts to "corruptly ... influence, intimidate, or impede any witness in any proceeding pending before ... Congress;"

clause [2] addressed efforts to "corruptly ... influence, obstruct, or impede [a] the due and proper administration of the law ... or [b] the due and proper exercise of the power of inquiry [in a proceeding before Congress]." *See* Act of January 13, 1940, ch. 1, § 135(a), 54 Stat. 13 (1940). In light of the first clause, which criminalized attempts to induce a witness to violate his legal duty, the second clause, which contains the wording now in section 1505, would be superfluous if it was construed as the majority would construe it. Furthermore, it is absurd to point, as the majority does, to Senator O'Mahoney's statement that the bill did not intend to restrict the rights of witnesses appearing before Congress, *see* Maj.Op. at 381 (citing 84 Cong. Rec. at 10526 (1939)), as evidence that the bill did not intend to criminalize a witness's violation of his legal duty. A witness has never had the right to violate his legal duty—especially his duty not to lie.

Today the witness protection provisions in the first clause of the 1940 statute are found in section 1512 along with the witness protection provisions that existed in an earlier version of section 1505. *See* 18 U.S.C. § 1512. Again, nothing in the history behind section 1512 directly addresses the meaning of the term "corruptly" in section 1505. As the majority notes, section 1512 does not criminalize attempts by the witness to mislead Congress himself, *see* Maj.Op. at 383; it seems clear to me that the term "corruptly" in Section 1505 does.

Recent decisions of this court have made the special prosecutor's path a most difficult one. *In re Sealed Case,* 838 F.2d 476 (D.C.Cir.1988) told him that he was unconstitutional. After the Supreme Court reassured him that he was not, *Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), he was roadblocked by the new variations on *Kastigar* set forth in this court's *North* decisions. Today this court unfairly decides that even though the proper *Kastigar* standards were not enunciated until after the trial in this case, the

special prosecutor will not get a chance to apply them. I dissent.