978 F.2d 1260
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert H. ZEMAN, Defendant-Appellant.
 No. 92-5097.
 United States Court of Appeals, Sixth Circuit.
 Nov. 9, 1992.
 
 Before RALPH B. GUY, Jr. and BATCHELDER, Circuit Judges, and LIVELY, Senior Circuit Judge.
 RALPH B. GUY, JR., Circuit Judge.
 
 
 1
 Defendant, attorney Robert Zeman, appeals his conviction and sentence imposed for conspiracy to obstruct justice. 18 U.S.C. §§ 371 and 1512(b)(1). A jury found that Zeman had conspired with his client, David Hockersmith, to corruptly prevent Hockersmith's employee, Glenn Hughes, from testifying against Hockersmith. On appeal, defendant alleges that (1) several erroneous evidentiary rulings resulted in an unfair trial; (2) the evidence was insufficient to convict; (3) the prosecutor impermissibly inflamed the jury during closing arguments; (4) the court erroneously instructed the jury to disregard part of defendant's closing argument; (5) section 1512, as applied, contravened his rights under the First, Fifth, and Sixth Amendments; and (6) Zeman, at most a minimal participant in any criminal activity, is entitled to a reduction in his sentence under U.S.S.G. § 3B1.2. For reasons that follow, we affirm the conviction and sentence.
 
 I.
 
 2
 Between 1979 and 1989, the "Hockersmith Organization" engaged in large scale drug trafficking in Louisville, Kentucky. Zeman, a long-time friend of the Hockersmith family, had represented several family members, including David Hockersmith, who led the organization during the relevant period. Defendant's conviction arose from the following events.
 
 
 3
 On November 21, 1988, Hughes, a courier for the organization, was arrested for traffic violations while transporting 10 kilograms of pure cocaine secreted in Hockersmith's car.[1] Police did not discover the contraband until after Hughes had been released on bond from the Jefferson County jail. Following Hughes' release, Hockersmith gave him money to leave town and subsequently wired more money to Hughes in Indianapolis.
 
 
 4
 Hughes returned to Louisville a few weeks after a fugitive warrant for him was issued. He told Hockersmith that "for enough money [he] would just disappear" (app. 165) and that he also considered turning himself in. A few days later, Hockersmith told Hughes to call Zeman, who knew of Hughes' fugitive status. When Hughes called, Zeman told Hughes that "he needed more time and did [Hughes] have any relatives [he] could stay with." (App. 166). A few days later, Hughes' mother urged him to turn himself in but he refused, stating that he had to wait two weeks for Zeman.
 
 
 5
 Hughes' family, concerned about Zeman representing both Hughes and Hockersmith, retained attorney David Kaplan, who immediately had Hughes turn himself over to the authorities. The next morning, Zeman visited Hughes in jail and told him not to talk to anyone. Hughes told him that he already had a lawyer.
 
 
 6
 Zeman subsequently discussed with Hockersmith and Kaplan whether Hughes would incriminate Hockersmith and also discussed payment of five or ten thousand dollars by Hockersmith to Kaplan. Kaplan advised Hughes not to be a "snitch." Hockersmith's funds were seized in January 1989, before any payment was made. In February, Hughes' mother convinced Hughes to cooperate with the authorities. Hockersmith was murdered nine months later, in November 1989.
 
 
 7
 Subsequently, a grand jury returned a 31-count indictment charging 31 codefendants. Thirty counts involved drug-related offenses; defendant was charged with a single count of conspiring with the decedent to corruptly prevent Hughes from testifying in violation of § 1512(b)(1).[2]
 
 
 8
 At trial, Zeman's defense was that there is nothing illegal per se about payment by a third party or codefendant for legal fees to lessen the likelihood of a plea bargain. A jury found defendant guilty, and the court sentenced him to 57 months imprisonment and two years supervised release. Defendant filed this timely appeal.
 
 
 9
 We address the issues seriatim.
 
 II.
 A. Evidentiary Rulings
 
 10
 The government's proof included testimony regarding the history and extent of the Hockersmith's drug trafficking operations and Zeman's connection as a legal adviser and friend. Zeman contends that the government, by focusing the jury's attention on the criminal acts of others, secured his conviction through "guilt by association" rather than by guilt of the crime alleged. Specifically, Zeman claims that Sgt. Ashcraft, Special Agent Noble, and four participants in the organization--Glenn Hughes and Curtis, James, and Tammy Hockersmith--should not have been allowed to testify as to arrests made, evidence seized, and the death by overdose of Silas Hockersmith, the organization's founder. This error was compounded, defendant maintains, by (a) the government's use at trial of a chart which included defendant's named in the depiction of the members of the organization and their various roles, and (b) the government's stacking of the 10 kilograms of cocaine, seized from the car driven by Hughes, on the counsel table during examination of its first witness.
 
 
 11
 Only relevant evidence may be admitted at trial. Fed.R.Evid. 402. To be relevant, evidence need only have some bearing on the probability of "the existence of any fact that is of consequence to the determination of the action." Fed.R.Evid. 401. When the probative value of otherwise admissible evidence is substantially outweighed by the danger of unfair prejudice, such evidence may be excluded. Fed.R.Evid. 403. This balancing is committed to the sound discretion of the trial court, our review of which is limited. United States v. Zipkin, 729 F.2d 384, 389 (6th Cir.1984). We view the evidence in the "light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." Id. (citations omitted).
 
 
 12
 The testimony complained of was relevant, probative, and not unfairly prejudicial. It provided context and showed a motive for the conspiracy--Hughes' testimony could destroy a lucrative and highly organized drug empire.[3]
 
 
 13
 Ashcraft testified regarding his participation in a joint state and federal task force which had begun investigating the organization in January 1988. He explained that David came to head the operation following the deaths of David's brother, Silas, and half-brother, Michael. When Ashcraft went to investigate Silas' death in 1987, Zeman was present with Silas' family and identified himself as a family friend. Zeman also represented James, Curtis, and Tammy Hockersmith upon their arrests in prior years. Ashcraft described the circumstances surrounding Hughes' arrest, the extent of Hughes' involvement, and the mutual importance of his cooperation. Through Hughes, the government obtained information ranging all the way back to ring leaders in Florida; Hughes received a substantial reduction in sentence.[4] Despite the benefit to Hughes in cooperating, it was Hughes' mother, not Kaplan, who discussed a plea bargain with Hughes and the government.
 
 
 14
 Ashcraft's testimony enabled the jury to understand what the organization and Hughes had at stake and to evaluate the testimony which followed. It rendered plausible James' subsequent testimony that Zeman, who not only knew James but had represented him, told James to tell Hockersmith to get money together to keep Hughes quiet. Task force member Special Agent Noble explained the wiretap, pen registers, and other surveillance techniques employed to investigate the organization, including Zeman. Tammy briefly mentioned her arrest and representation by Zeman before she testified to the identity of the voices on the tapes of wiretap evidence, discussed below. Curtis' brief discussion of his arrest and representation by Zeman corroborated Ashcraft's testimony. Finally, Hughes' testimony regarding his role in the empire and the events surrounding his arrest went to the conspiracy's raison d'etre. Although some prejudice may always attend evidence of drug trafficking, drug dealing is precisely what the conspiracy meant to protect. The court did not abuse its discretion in permitting the testimony.
 
 
 15
 We also find that the government's use of demonstrative evidence did not result in an unfair trial. Through Ashcraft, the government introduced photographs of the 10 kilograms seized which the witness stated was worth $2,000,000, the largest seizure in Kentucky history. After a sidebar requested by the government, the court permitted the cocaine to be placed on the counsel table for Ashcraft's identification. It was removed immediately after his testimony. This limited viewing of the cocaine was not unfairly prejudicial. Moreover, it permitted the jury to more fully appreciate the magnitude of the operation, the risk to Hughes in not cooperating, and Hockersmith's vulnerability if he did. Cf. United States v. Arango-Correa, 851 F.2d 54 (2d Cir.1988).
 
 
 16
 Similarly, the demonstrative use of an organizational chart which, indisputably, accurately diagramed the roles of key players, including witnesses, facilitated the jury's understanding of the trial testimony. This circuit has long allowed such pedagogical use of summaries; control over their use is committed to the discretion of the trial court. United States v. Paulino, 935 F.2d 739, 753 (6th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 883 (1992); Fed.R.Evid. 611(a).
 
 
 17
 Defendant charges, however, that the government deliberately deceived the jury and misled defense counsel by including Zeman's name at trial in black--the color code for a drug supplier--further highlighted in yellow, while it appeared in pencil at pretrial. Moreover, he contends, the inclusion of his name unfairly portrayed him as an active participant--the brains behind the operation. These attacks are meritless.
 
 
 18
 The government used the chart in trying various defendants. The final copy with Zeman's name in black, used only for his trial, was not available to the government at pretrial. Defense counsel was on notice that Zeman's name would be included, and the government fully explained to the jury that defendant was not a drug supplier and that black, distinguished by yellow highlighter, was used because the chartmaker had run out of colors. We find nothing inherently prejudicial in the mere inclusion of defendant's name, which appeared alone, underneath the name of David Hockersmith, the decedent co-conspirator.
 
 
 19
 We recognize that "a summary should be accompanied by a limiting instruction which informs the jury of the summary's purpose and that it does not constitute evidence." Paulino, 935 F.2d at 753. Defendant, who did not request such instruction, cross-examined Ashcraft concerning his preparation of the chart and its meaning, "thereby 'alleviat[ing] any danger of inaccuracy or unfair characterization.' " Id. We have already found the chart neither significantly prejudicial nor misleading. In addition, the judge, although not explicitly mentioning the chart, instructed the jury that what the lawyers say does not constitute evidence and to consider only exhibits admitted in the record. Under these circumstances, we find no error. See id. at 753-54.
 
 
 20
 Zeman next challenges two of the court's evidentiary rulings regarding Kaplan's testimony. Kaplan, who had made two prior statements to the authorities, surprised the government with extreme recalcitrance at trial. He did, however, testify that he had conversations with Zeman about payment by Hockersmith, in exchange for which Kaplan and Hughes would be expected to maintain the "status quo," i.e., Hughes would continue to feign ignorance of the cocaine seized from Hockersmith's car. He further opined that Zeman knew that their conversations were about money to keep Hughes quiet. The latter, defendant maintains, constituted impermissible opinion testimony that defendant possessed the requisite criminal intent as opposed to the witness's mere interpretation of defendant's statements, deemed permissible in United States v. Graham, 856 F.2d 756, 759 (6th Cir.1988), cert. denied, 489 U.S. 1022 (1989). Analyzed in context, we do not find the statement unduly prejudicial.
 
 
 21
 Lay opinion testimony regarding the meaning of another's statements is permissible if "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed.R.Evid. 701. Such testimony is often admitted when the plain meaning of words used does not express the information conveyed. For example, in Graham, we found no error in the testimony of an FBI agent that defendant intended a bribe when he had asked the witness for a campaign contribution. Id; see also United States v. De Peri, 778 F.2d 963, 977 (3d Cir.1985) (statements sounded like code to uninitiated listener) (cited with approval in Graham ), cert. denied, 475 U.S. 1110 (1986).
 
 
 22
 In this case, the witness, clearly antagonistic to the government, was highly evasive and failed to recollect details, including words used. He did remember, however, what words were not used--those whose plain meaning expressed the witness's understanding. There is no dispute that his testimony as to what was expected upon payment met the requirements of Rule 701. Kaplan's reluctant characterization of the content of the conversations was based upon his perceptions and helpful to an understanding of what had transpired. The challenged statement that Zeman knew what was meant, whether or not problematic in form, is fairly understood as a reiteration of the witness's prior permissible opinion.
 
 
 23
 We note that the defense conducted an extensive cross examination, during which the witness acceded that he had surmised or guessed at the purpose of the fee. The jury was clearly alerted that the challenged testimony might deserve little weight. Moreover, whatever the impropriety, the statement was but one made in a lengthy examination of the witness and went unemphasized throughout the course of trial. Since we do not find it probable that the statement materially affected the verdict, any error was harmless. United States v. Williams, 952 F.2d 1504, 1518 (6th Cir.1991); Torres v. County of Oakland, 758 F.2d 147, 151 (6th Cir.1985) (finding harmless "one brief question out of a rather lengthy trial").
 
 
 24
 During cross examination, Kaplan stated that his behavior conformed to the ethical norms of the legal profession. Defense counsel then sought to ask Kaplan if there was anything illegal in what he and defendant had done. The court, noting that "[t]hat's for the jury to decide under the instructions of the Court," (app. at 225), prohibited the inquiry. Defendant claims that the question was proper under Federal Rule of Evidence 704.
 
 
 25
 Rule 704 provides that opinion testimony, "otherwise admissible[,] is not objectionable because it embraces an ultimate issue to be decided...." (Emphasis added). We have previously made clear that witnesses' legal conclusions are properly excluded as not otherwise admissible. Torres, 758 F.2d at 150. Such opinions are not helpful to the jury because they "convey[ ] the witness' unexpressed, and perhaps erroneous, legal standards...." Id.; Fed.R.Evid. 701, 702. Accordingly, such testimony may invade the province of the court and jury, to instruct and apply the law, respectively. Id. The court did not abuse its discretion.[5]
 
 B. Sufficiency
 
 26
 Evidence is sufficient if, "after reviewing [it] in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). A conviction may rest on circumstantial evidence alone, and such evidence need not remove every reasonable hypothesis except that of guilt. United States v. Stone, 748 F.2d 361, 363 (6th Cir.1984), coram nobis denied, 895 F.2d 1415 (6th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 71 (1990).
 
 
 27
 The government was required to prove that (1) defendant and at least one other person agreed to acts which, if consummated, would violate § 1512(b)(1), United States v. Frost, 914 F.2d 756, 762 (6th Cir.1990); (2) an overt act in furtherance of this agreement, id.; and (3) that Zeman possessed the "criminal intent necessary for [a § 1512(b)(1) ] offense," United States v. Feola, 420 U.S. 671, 686 (1975). A conspiracy need not involve a formal agreement. Frost, 914 F.2d at 762. A tacit understanding may suffice. United States v. Gresser, 935 F.2d 96, 101 (6th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 239 (1991).
 
 
 28
 Sufficient evidence of an agreement existed. Wiretap evidence disclosed the following colloquy between Zeman and Hockersmith on December 14, 1988, the day after Hughes surrendered himself to the authorities:
 
 
 29
 (phone rings one long ring)
 
 
 30
 ZEMAN: Hello.
 
 
 31
 DAVID: How you doin?
 
 
 32
 ZEMAN: Hey babe. OK. I saw your man down there.
 
 
 33
 DAVID: Uh huh.
 
 
 34
 ZEMAN: Yeah, shit, I don't know why he turned himself in. His sister, I told you that family was nutty.
 
 
 35
 DAVID: Yeah. Belinda, she did that.
 
 
 36
 ....
 
 
 37
 ZEMAN: I guarantee it. Well, anyway, um, so, I'm supposed, I'm going to talk to him again. I just talked to him briefly today. They were moving him, see ...
 
 
 38
 DAVID: Uh huh.
 
 
 39
 ZEMAN: But they gonna be hot on him, and pressure and all that stuff.
 
 
 40
 DAVID: Just tell him to keep his mouth shut.
 
 
 41
 ZEMAN: Well let's don't, let's not talk over the phone. But, a, like I say, can you tighten me up a little bit.
 
 
 42
 DAVID: I'll see what I can do.
 
 
 43
 ZEMAN: OK.
 
 
 44
 ....
 
 
 45
 ZEMAN: We'll get something goin. Now he's, he's got a lawyer, okay?
 
 
 46
 DAVID: A, who is he?
 
 
 47
 ZEMAN: Well Kaplan, But I know Kaplan....Kaplan... won't do nothin. OK?
 
 
 48
 DAVID: Right.
 
 
 49
 ZEMAN: He won't do anything see?
 
 
 50
 DAVID: Uh huh.
 
 
 51
 ZEMAN: And, uh, I'll be able to keep tabs on everything going on.
 
 
 52
 DAVID: OK.
 
 
 53
 ZEMAN: So,
 
 
 54
 DAVID: I need to know everything.
 
 
 55
 ZEMAN: Oh, yeah, yeah, definitely. Just give me a call back today, but we shouldn't, like I say, let's don't ...
 
 
 56
 DAVID: Right.
 
 
 57
 ZEMAN: Whole bunch of details on the phone.
 
 
 58
 DAVID: OK, they not goin be lookin me are they?
 
 
 59
 ZEMAN: Naw, no.
 
 
 60
 DAVID: OK, so, right ...
 
 
 61
 (Tape Exhibit # 42).
 
 
 62
 Kaplan testified that he had several conversations with Zeman, beginning around December 15, about the possibility of Kaplan's receiving $5,000 to $10,000. As mentioned above, the men discussed whether or not Hughes' testimony would change. Kaplan understood that the money was for Hockersmith's benefit--to keep Hughes from implicating him. Although Kaplan said that if he had received the money he would probably have entered it in his books as a legal fee, when asked if it was in fact a legal fee, he replied: "It could be or could not be. Label wouldn't mean anything." (App. at 206). Kaplan never told the Hughes family, who was paying his fee, that someone else might be making payments. Kaplan told Hughes not to be a squealer. Although he had stated that his client's chances of winning at trial were "slim to none" and that "slim just left town," he never discussed the possibility of a plea agreement with Hughes or the authorities.
 
 
 63
 Hughes' mother repeatedly tried to contact Kaplan, but he never returned her calls. Hughes had complained to her that Kaplan had not been to see him. She sent Kaplan an additional $500, hoping that he would answer her messages and visit her son in jail.[6]
 
 
 64
 In early January, Zeman told James Hockersmith to tell David to get money together to keep Hughes quiet. James told David, who replied that he knew about it.
 
 
 65
 On January 20, 1989, Tony Luke, a member of the organization, and Hockersmith discussed how to ensure Hughes' silence.[7] Hockersmith said that "it's an open and shut case unless they get him to start talking." Luke wanted Hockersmith to "send somebody up there" to take care of it. "No," Hockersmith replied, "He [sic] got an attorney. I keep giving him something. That's all I can do, you know." (Tape Exhibit # 13). Five days later, Zeman and Hockersmith took up the topic.
 
 
 66
 DAVID: All right. You know whatchacalit go to court tomorrow.
 
 
 67
 ZEMAN: Huh?
 
 
 68
 DAVID: Glenn.
 
 
 69
 ZEMAN: Glenn goes to court?
 
 
 70
 DAVID: Uh huh.
 
 
 71
 ZEMAN: For a pretrial. It's just a pretrial.
 
 
 72
 DAVID: Yeah. They're trying to, she said he said he was gonna tell everything.
 
 
 73
 ZEMAN: When did you talk to him?
 
 
 74
 DAVID: I haven't. Somebody else talked to him.
 
 
 75
 ZEMAN: Well, we ought to get to his lawyer then.
 
 
 76
 DAVID: Can you?
 
 
 77
 ZEMAN: Yeah! If you got any bread.
 
 
 78
 DAVID: Shit.
 
 
 79
 ZEMAN: Huh? Can you come up with anything?
 
 
 80
 DAVID: What's he needin?
 
 
 81
 ZEMAN: He wants five.
 
 
 82
 DAVID: I ain't givin him no five. I don't think it's worth it.
 
 
 83
 ....
 
 
 84
 ZEMAN: Well ... how about, a, can we give him something just to hold this thing off and you get some, you know ... you know, can you come up with twenty five hundred?
 
 
 85
 DAVID: Give him that?
 
 
 86
 ZEMAN: Yeah. Bring it down to me and let's ...
 
 
 87
 DAVID: Uh huh. Well do you, do you, okay ... (deep sigh) ... yeah.
 
 
 88
 ZEMAN: Uh, can you meet me down here after while?
 
 
 89
 DAVID: No, I, I gotta get it first.
 
 
 90
 ZEMAN: Oh, OK.
 
 
 91
 DAVID: Yeah.
 
 
 92
 ZEMAN: Well you, why don't you give me a call tonight about eight?
 
 
 93
 DAVID: OK.
 
 
 94
 ZEMAN: OK?
 
 
 95
 DAVID: All right.
 
 
 96
 ZEMAN: Call me at home. All right?
 
 
 97
 (Tape Exhibit # 43).
 
 
 98
 The next day, Zeman tried to contact Hockersmith. He left a message with Tammy that "we're tryin[g] to meet at this lawyer's office at three." (Tape Exhibit # 71). That evening the authorities seized funds from Hockersmith and the liquor store which was the base of operations. Zeman called Tammy the next day. Fearing that the authorities would freeze the business account, he told her to withdraw the funds and not tell anyone. (Tape Exhibit # 4). Kaplan testified that the Hockersmiths were "cleaned out" and never paid him.
 
 
 99
 Viewing this evidence in the light most favorable to the government, a rational juror could find beyond a reasonable doubt that Zeman and Hockersmith agreed to corruptly persuade Kaplan, i.e., pay Kaplan to disregard his own client's best interests, to prevent Hughes' testimony. See 18 U.S.C. § 1512(b)(1).[8]
 
 
 100
 Turning to the next element, § 1512(b)(1) requires intent to affect testimony in an "official proceeding." Official proceedings include those before various federal courts, judges, magistrate judges, or a federal grand jury. 18 U.S.C. § 1515(a)(1)(A). The "proceeding need not be pending or about to be instituted at the time of the offense," § 1512(e), and a defendant need not be cognizant of its federal character, § 1512(f). See United States v. Scaife, 749 F.2d 338, 348 (6th Cir.1984). Citing United States v. Shively, 927 F.2d 804 (5th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2806 (1991), Zeman claims the government failed to prove his intent to affect testimony at a particular federal proceeding.
 
 
 101
 In Shively, defendants engaged in a conspiracy to burn a home owned by two co-conspirators, the Shivleys, and share the insurance proceeds. When the insurance company, suspecting fraud, refused to pay, the homeowners sued the insurance company in state court. The defendants then threatened Shively's employee and his wife, the Coplins, demanding that the Coplins become favorable witnesses in their suit against the insurance company. The government argued that, since one defendant had been questioned by a state fire investigator who indicated that the Bureau of Alcohol, Tobacco and Firearms was participating in the investigation, one purpose for the intimidation was to deter the Coplins' honest testimony in any subsequent grand jury proceeding. The court, noting that (a) the "exact parameters and dates of the federal investigation" were obscure, 927 F.2d at 811; (b) no federal indictment ensued until two and one-half years after the intimidation; and (c) no evidence existed that the Coplins ever testified before a grand jury; held that the intent must concern "some particular federal proceeding that is ongoing or is scheduled to be commenced in the future." Id. at 812-13. Whatever the merits of Shively, it is distinguishable on its facts.
 
 
 102
 In this case, a combined state and federal task force had been actively investigating the drug operation since well before Hughes' arrest. The desire to silence Hughes unquestionably arose from fear of imminent state and federal prosecution. Luke explicitly told Hockersmith that "[Hughes] gonna get fucked with it too. You know what I'm sayin'? They gonna try to indict you at the grand jury and the Commonwealth will probably ... pick it up." (Tape Exhibit # 13). Hughes' cooperation and subsequent testimony before a grand jury culminated in a 31-count indictment charging 31 codefendants. This testimony is precisely what Hockersmith intended to prevent. We find that there was sufficient evidence of intent regarding an official proceeding within the meaning of § 1512.
 
 
 103
 We hold that there was sufficient evidence as to the elements of the conspiracy.
 
 III.
 Closing Arguments
 
 104
 In closing, defense counsel, Haddad, argued that the main reason the government brought in the organizational chart and cocaine "was to prejudice [its] thinking against Mr. Zeman." (App. 404). The government objected. At sidebar, Haddad stated that he wanted to argue that the government hoped the displays would make it appear that Zeman was part of a drug operation. The court, finding this argument permissible but not the use of the word "prejudicial," admonished the jury to disregard Haddad's prior statement.[9] Zeman contends, however, that the court's admonition crippled his defense, constituting reversible error. We disagree for three reasons.
 
 
 105
 First, "the trial court has broad discretion to control closing argument." United States v. Poindexter, 942 F.2d 354, 359 (6th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 615 (1991), modified sub nom. United States v. Day, 956 F.2d 124 (6th Cir.1992). Second, immediately after the court's interjection, Haddad made the precise argument to the jury that he had described to the court at the sidebar. He stressed that the jury was not trying a drug case and that these displays were unnecessary to try the allegations. Third, the record shows that Haddad's inability to use the word "prejudicial" did not interfere with his presentation of a vigorous defense.
 
 
 106
 Defendant next maintains that the prosecutor's inflammatory statements deprived him of a fair trial. In his opening statement, Haddad told the jury that "[n]o one was harmed. There was no victim." (App. 421). The government, at the end of its closing argument, reminded the jury of these remarks and stated:
 
 
 107
 I submit to you, ladies and gentlemen, that Glenn Hughes was a victim. He was not having a lawyer represent him the way he was supposed to.
 
 
 108
 ....
 
 
 109
 I would also submit to you, ladies and gentlemen, that all of society is harmed. If we can have rich people come in here and pay witnesses off, does that mean justice is for sale, that our system can be bought? There is a victim. There is harm when we let this kind of stuff go on unchecked and unaccounted for.
 
 
 110
 Bob Zeman went too far. Defense attorneys--this is not about prosecutors versus defense attorneys. Prosecutors and defense attorneys have roles in this system. I respect and understand the importance of their role[s] in our system. This is not about them representing defendants. It's about Bob Zeman going too far to protect his client by paying somebody off or attempting to, to keep Glenn quiet.
 
 
 111
 Please send a message today that Bob Zeman and any lawyer who tries to do this is not above the law.
 
 
 112
 (App. 421) (Emphasis added). Zeman urges that the two underscored statements impermissibly appealed to the jury's class bias and community conscience, respectively.
 
 
 113
 Defendant failed to object to these statements at trial. Accordingly, reversal is not warranted unless these statements, considered in the context of the entire proceeding, were so egregious as to "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." United States v. Young, 470 U.S. 1, 16 (1985) (plain error standard). The following factors are relevant to our determination:
 
 
 114
 the degree to which the remarks ... have a tendency to mislead the jury and to prejudice the accused; whether they were isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proofs introduced to establish the guilt of the accused.
 
 
 115
 United States v. Leon, 534 F.2d 667, 679 (6th Cir.1976) (citations omitted).
 
 
 116
 Viewed in context, the first statement did not render the trial unfair. Although the reference to rich people was inappropriate, the record shows that it was part of an isolated statement made in the heat of battle in response to the opening remarks of the defense. We cannot conclude that it caused the jury to stray from its task to weigh and reason impartially.
 
 
 117
 Turning to the next statement, "[u]nless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible." United States v. Solivan, 937 F.2d 1146, 1151 (6th Cir.1991). In Solivan, the prosecutor entreated the jury to tell the defendant, whom he called a wholesale drug distributor, "and all other drug dealers like her ... [t]hat we don't want that stuff in Northern Kentucky...." Id. at 1148. Analyzing these statements against the backdrop of current events, namely the "War on Drugs," we concluded that the prosecutor intended to inflame the jury's passions and accomplished this end. Finding that the error was not harmless, we reversed. Zeman claims that his case falls squarely under Solivan. The government counters that United States v. Alloway, 397 F.2d 105, 113 (6th Cir.1968), distinguished in Solivan, controls.
 
 
 118
 In Alloway, defendant was charged with armed robbery. We found permissible the following remarks by the prosecutor:
 
 
 119
 You, the jurors, are called upon in this case to be the world conscience of the community. And I'm calling on this jury to speak out for the community and let the John Alloways know that this type of conduct will not be tolerated.
 
 
 120
 Solivan, 937 F.2d at 1154 (quoting Alloway, 397 F.2d at 113). We noted in Solivan that, unlike the War on Drugs, there was no national attention focused on armed robbery and that the prosecutor in Alloway, who never specifically referred to the crime, "did not go beyond a mere allusion to the general need to convict guilty people." Id.
 
 
 121
 In this case, although the crime involved drug dealers, the government's appeal to the community does not warrant a new trial. The ending comments were clearly intended to rebut the "no victim" argument of the defense. The government emphasized that the jury should not be prejudiced against defense attorneys, that their role in the system deserves respect, but that attorneys who go too far are not above the law. We conclude that the government's request to send a message was more like the general entreaty to convict guilty people made in Alloway than the specific appeal to keep Kentucky drug free made in Solivan; it was neither calculated to inflame nor so inherently prejudicial as to compromise the integrity of the verdict.
 
 
 122
 We also find that the combined effects of both statements complained of do not constitute plain error.
 
 IV.
 Constitutionality
 
 123
 Zeman contends that he did no more than try to arrange third-party payment of legal fees, which is expressly authorized by Model Rules of Professional Conduct Rule 1.8(f) and which implicates constitutional guarantees.[10] He argues that by criminalizing such conduct and doing so without notice, § 1512(b)(1), as applied to him through § 371, is both vague and overbroad.[11] Zeman cites United States v. Poindexter, 951 F.2d 369 (D.C.Cir.1991), to support his assertion that § 1512(b)(1) is unconstitutionally vague as applied to him.
 
 
 124
 In Poindexter, the D.C. Circuit reversed former National Security Advisor John Poindexter's conviction pursuant to § 1505 for lying to Congress. Section 1505 criminalized any obstruction or corrupt influence of any agency or congressional proceeding. The D.C. Circuit found this language too vague to provide constitutionally adequate notice to an individual who himself made false statements to Congress. Poindexter, 951 F.2d at 379. After examining the plain text and legislative history of the statutory provision, the court found that § 1505 ultimately did not criminalize a "witness's violation of his own legal duty." Id. at 382.
 
 
 125
 Relevant to this case, the court based its reading of § 1505 in part on its analysis of § 1512. In considering the terms "obstruction" and "corrupt influences", the court distinguished a witness's own self-serving fabrications from a witness pressured into lying to a tribunal. Sections 1505 and 1512 reached only the latter activity, according to the court, by criminalizing attempts to pressure or influence witnesses. Id. at 383. Poindexter pressured no one, thus the court found his activity beyond the reach of § 1505.
 
 
 126
 Clearly, then, Poindexter provides no support for Zeman. Indeed, the court in Poindexter reaffirmed that § 1512 criminalizes the very conduct at issue in this case. Zeman was not convicted of conspiracy to affect Hughes' testimony through legal means, i.e., payment of a legal fee in conformity with ethical standards. We have already stated that sufficient evidence existed that Zeman sought to accomplish his goal by interfering with Kaplan's duty to his own client. This is the very sort of conduct which § 1512 reaches; namely, the improper influence of another. Thus, Zeman's argument is meritless.
 
 V.
 Sentencing
 
 127
 Zeman avers that the court should have reduced his offense level pursuant to United States Sentencing Commission, Guidelines Manual, § 3B1.2 (Nov. 1991). Defendant was sentenced as follows.
 
 
 128
 Applying § 2X1.1, covering conspiracies, the court looked to the obstruction of justice guideline which provides that in cases involving "obstructing the investigation or prosecution of a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above." U.S.S.G. § 2J1.2(c)(1). Pursuant to § 2X3.1, the court determined the base offense level by subtracting six from the offense level for the underlying offense, which was possession of 10 kilograms of cocaine. Zeman's final offense level was 25. Zeman argues that he was a minimal participant in the drug offense and is, therefore, entitled to a four-level reduction. U.S.S.G. § 3B1.2.
 
 
 129
 Defendant bears the burden of proving, by a preponderance of the evidence, his status as a minimal participant. United States v. Anders, 899 F.2d 570, 580 (6th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 532 (1990); United States v. Rodriguez, 896 F.2d 1031, 1032 (6th Cir.1990). The Sentencing Commission intended that minimal status reductions occur infrequently. U.S.S.G. § 3B1.2, comment. (n. 2). Reductions are reserved for cases where defendant's involvement is extremely limited, for example, when a defendant lacks "knowledge or understanding of the scope and structure of the enterprise." U.S.S.G. § 3B1.2, comment. (n. 1). Most importantly, "[t]he adjustment from § 3B1.2 ... normally [does] not apply" to sentences calculated pursuant to § 2X3.1, "because an adjustment for reduced culpability is incorporated in the base offense level." U.S.S.G. § 2X3.1, comment. (n. 2).
 
 
 130
 The record shows no basis for the claimed reduction. Defendant received the six-point decrease provided under § 2X3.1 and has shown no set of facts warranting further leniency. He was fully aware of the magnitude of the criminal enterprise he conspired to protect.
 
 
 131
 AFFIRMED.
 
 
 132
 LIVELY, Senior Circuit Judge, concurring.
 
 
 133
 I concur in the result, but not in the entire majority opinion. In my judgment the district court clearly abused its discretion in permitting the prosecution to display before the jury the 10 kilograms of cocaine and the organizational chart of the Hockersmith drug ring. Only overwhelming evidence of the defendant's guilt on the single charge for which he was tried leads me to conclude that these errors were harmless.
 
 
 134
 Although the defendant was not charged with distributing drugs or even with aiding and abetting in their distribution, a great deal of trial time was devoted to describing the organization and illegal activities of the Hockersmith group. The prosecution argues that this was necessary in order to explain to the jury why a lawyer would obstruct justice, the crime for which the defendant was being tried. Assuming such necessity, this need was easily satisfied by producing the testimony of no less than four members of the Hockersmith organization and several police officers who described the organization and its activities in vivid detail.
 
 
 135
 Not content with this testimonial evidence, the prosecutor stacked 10 kilograms of cocaine in front of the jury and displayed a chart to the jury that showed the defendant at the very center of the Hockersmith organization. Neither display was needed to explain the defendant's motive for attempting to control Hughes' testimony. Witnesses had described the seizure of the cocaine and estimated its value. Furthermore, the prosecutor introduced photographs of the seized drug. In our world today where so much is written and spoken about the evils of the illegal drug trade and its destructive effect on society, the unnecessary display of the actual contraband was highly prejudicial and should not have been permitted.
 
 
 136
 In my opinion, display of the organization chart with the defendant's name at the very center was even more "overkill." Witnesses described the defendant's only relationship to the drug ring. As an attorney, he represented some of its members. No one testified that he was ever involved in any way with the "business" of the organization. And, of course, he was not charged with any drug transactions. If the chart was required to show the extent of the organization's drug activities, that would have served the prosecutor's need to show "background." But, to place the defendant's name at the center of the chart, in the same color (black) used to identify drug suppliers and highlighted in yellow was unfair and extremely prejudicial. Except for the fact that the taped conversations were so damning, I would vote to reverse the conviction. I must conclude, however, that no jury hearing those conversations would have acquitted the defendant, with or without the improperly admitted demonstrative evidence. FED.R.CRIM.PRO. 52(a); United States v. Phillip, 948 F.2d 241, 251 (6th Cir.1991) ("Generally, an error not rising to constitutional significance is harmless 'unless it is more probable than not that the error materially affected the verdict.' " (citation omitted)).
 
 
 
 [1]
 Hockersmith refers to David Hockersmith unless otherwise indicated
 
 
 [2]
 That section proscribes the "corrupt[ ] persua[sion] [of] another person ... with intent to influence, delay, or prevent the testimony of any person in an official proceeding[.]"
 
 
 [3]
 The government points out that, although "[e]vidence of other crimes, wrongs or acts is not admissible to show," Fed.R.Evid. 404(b), the propensity for criminal behavior from which the jury might infer guilt of the specific crime alleged, such evidence, if deemed not unduly prejudicial under Rule 403 may be admitted for a proper purpose, such as "motive, opportunity, intent ... plan, [or] knowledge." Id. Whether or not the evidence complained of is explicitly analyzed under Rule 404(b), the outcome would be the same
 
 
 [4]
 The Commonwealth of Kentucky rewarded Hughes with at least a ten-year reduction in sentence. Hughes was not prosecuted in federal court
 
 
 [5]
 Defendant contends that he was highly prejudiced by Kaplan's acknowledgment, on redirect, that potential conflict of interest problems attended payment by Hockersmith. He argues that Kaplan's testimony regarding the legality of Zeman's conduct was necessary to cure this defect and the "error" previously discussed, in Kaplan's statement of Zeman's intent. Zeman suggests that the government unfairly emphasized ethics in the hope that the jury would conflate ethical standards with legal ones. The record shows, however, that the defense first raised and emphasized the topic. Moreover, the court permitted the testimony of rebuttal witnesses to testify as to the ethical implications of codefendant fee arrangements. The claim of unfair prejudice is unfounded
 
 
 [6]
 The family had already paid Kaplan $300 to represent Hughes
 
 
 [7]
 Luke later pleaded guilty to drug conspiracy
 
 
 [8]
 Defendant does not claim insufficient proof of an overt act
 
 
 [9]
 The court stated, "Ladies and gentlemen, you are admonished that the argument that the cocaine was brought in here for the purpose of prejudicing the jury is improper and should not have been made. You are not to consider it at all in your deliberations." (App. 406)
 
 
 [10]
 Rule 1.8(f) provides:
 A lawyer shall not accept compensation for representing a client from one other than the client unless:
 (1) the client consents after consultation;
 (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and
 (3) information relating to representation of a client is protected as required by Rule 1.6.
 Zeman argues that ethical third party-payments implicate the right to counsel and freedom of association.
 
 
 [11]
 We reject the government's argument that a defendant convicted under § 371 necessarily lacks standing to contest the vagueness or overbreadth of the substantive offense as applied to him